21CV04812
Div7

## IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
## TENTH JUDICIAL DISTRICT OF KANSAS

| | | |
|---|---|---|
| JOSE PEPPER'S RESTAURANTS, LLC | ) | |
| | ) | |
| and | ) | |
| | ) | |
| EDWARD J. GIESELMAN, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. |
| | ) | |
| v. | ) | Div. |
| | ) | |
| ZURICH AMERICAN INSURANCE | ) | K.S.A. Chapter 60 |
| COMPANY, | ) | |
| | ) | |
| Defendant | ) | |

### PETITION

Plaintiffs Jose Pepper's Restaurants, LLC and its principal owner Edward Gieselman allege the following petition against defendant Zurich American Insurance Company.

### PARTIES, JURISDICTION, AND VENUE

1.       Plaintiff Jose Pepper's Restaurants, LLC ("Jose Peppers") is a Kansas Limited Liability Company and is active and in good standing with the Kansas Secretary of State. Jose Peppers' resident agent and office is located at 8400 W. 110th St. Suite 600, Overland Park, Kansas 66210.

2.       Plaintiff Edward Gieselman is an individual residing in Johnson County, Kansas.

3.       Defendant Zurich American Insurance Company ("Zurich") is a corporation organized and existing under the laws of Illinois, authorized to do business and conducting business as an insurance company in the State of Kansas.

1728234v3

1

EXHIBIT

A

4.      Zurich was and is a licensed insurance company which does business in the State of Kansas, and issues policies concerning activities performed within Johnson County, Kansas and the State of Kansas.

5.      The Kansas Commissioner of Insurance is appointed as the agent to receive service on behalf of Zurich pursuant to K.S.A. 40-218, and may receive service at 1300 SW Arrowhead Road, Topeka, KS 66604-4073.

6.      Zurich conducts substantial, continuous, and systematic business in Johnson County, Kansas, including but not limited to the sale and issuance of professional insurance policies, and this cause of action arose in Johnson County, Kansas. Therefore, this Court has jurisdiction over Zurich and the subject matter of this action, and venue is proper in this Court.

FACTUAL BACKGROUND

*The Insurance Policy*

7.      Jose Peppers purchased an Employment Practices and Third Party Discrimination Liability policy from Zurich that took effect on April 1, 2020, and was in full force and effect during all times relevant to the allegations herein ("the Policy"). A copy of the relevant Policy is attached hereto as Exhibit 1.

8.      Mr. Gieselman, the Chief Operating Officer and sole member of Jose Peppers, is insured under the Policy.

9.      The Policy includes an aggregate limit of liability of $4,000,000 and an additional limit of liability for defense costs of $1,000,000.

10.     Under the terms of the Policy, Zurich undertook to insure Jose Peppers and Mr. Gieselman (together, "Jose Peppers") against liability for or arising out of Employment Practices and Third Party Discrimination Liability.

1728234v3

11.     Zurich agreed to pay on behalf of Jose Peppers all losses for which Jose Peppers becomes legally obligated to pay on account of any employment practices claim made against Jose Peppers during the Policy period.

12.     Under the Policy, Zurich's obligation to cover losses sustained by Jose Peppers extends to settlements and defense costs, including but not limited to attorneys' fees associated with the defense and/or investigation of claims.

13.     Jose Peppers performed and complied with all material terms, conditions precedent, obligations, and provisions contained in the Policy, except as to that performance which has been excused, waived, or prevented by the representations, acts, or omissions of Zurich.

14.     Jose Peppers is entitled to the full benefit of the insurance provided by the Policy, and is also entitled to coverage and payment of defense expenses due to Zurich's own actions over the course of the litigation.

*The Collective Action*

15.     On or about July 7, 2020, Kira Florece ("Florece") on behalf of herself and all others similarly situated, filed a collective action against Jose Peppers and its founder Edward Gieselman, alleging violations of the Fair Labor Standards Act as well as allegations relating to failure to pay minimum wage and overtime (the "Collective Action").

16.     On July 13, 2020, Jose Peppers submitted a claim to Zurich for defense and indemnity of the Collective Action under the Policy.

17.     On July 21, 2020, Zurich acknowledged receipt of the claim submission, assigned the claim the claim number of 9410665614 (the "Claim"), and further notified Jose Peppers that the claim was assigned to Brett Carrick ("Carrick") for handling.

18.     Zurich also informed Jose Peppers that "[o]nce Zurich has had an opportunity to review the information submitted, we will provide the Insured with an explanation of the insurance coverage afforded under the policy."

19.     Tyler Hibler, an attorney with the law firm of Husch Blackwell (the "Collective Action counsel"), was assigned to defend the case for Jose Peppers and Mr. Gieselman, and agreed to Zurich's attorney billable rates in defending the claim, well below his established billing rate.

20.     Mr. Carrick began collaborating with Mr. Hibler early on relating to defense strategy and estimated exposure.  For example, on August 12, 2020, Jose Peppers' Collective Action counsel sent Zurich a detailed update on the status of the litigation and further informed Zurich that the defense costs would quickly exceed Jose Peppers' self-insured retention ("SIR"). Collective Action counsel also sought approval from Zurich for staffing on the case, and consulted with Zurich on expected expenses for discovery such as electronic discovery cost estimate.

21.     Given Zurich's actions and representations, Mr. Gieselman understood Jose Peppers' maximum exposure was the $50,000 SIR; consequently, he elected to continue defending the claims instead of pursuing early settlement or resolution because he believed, and continues to believe, the claims in the Collective Action were and continue to be without merit.

22.     At the time the Collective Action was filed and throughout the pendency of the Collective Action, Mr. Gieselman was undergoing follow-up cancer care treatment at MD Anderson in Houston, Texas, which required Mr. Gieselman to travel between Kansas and Texas.

23.     On October 15, 2020, Jose Peppers' Collective Action counsel and a representative from Jose Peppers held a teleconference with Carrick to discuss strategy and defense of the case. During the teleconference, Carrick instructed Jose Peppers to submit all cost of defense bills to Carrick directly via email once Jose Peppers exceeded its SIR.

24.     Collective Action counsel continued to work with Zurich on defense of the case throughout its pendency.  For example, on February 17, 2021, Collective Action counsel updated Carrick on the status of discovery issues, sought guidance and permission for court reporting services for depositions, and requested Carrick inform counsel immediately if any adjustments need be made for invoicing based on Zurich's reporting guidelines and preferences.

25.     Collective Action counsel's February 2021 invoices for attorneys' fees and expenses were the first to exceed the SIR, and Jose Peppers duly submitted the invoices to Zurich as Carrick instructed beginning on February 17, 2021.

26.     Through facts learned in the course of discovery, the Collective Action plaintiffs developed new theories of recovery.  On March 17, 2021, the Court granted Florece leave to amend the Collective Action petition (the "Amended Complaint"). The Amended Complaint added claims relating to certain alleged employment-related actions by Jose Peppers during the COVID-19 pandemic, violation of tip-sharing rules and regulations, and failure to properly notify tipped employees of their compensation structure, among other things.

27.     On March 18, 2021, Carrick, representatives of Jose Peppers, and Jose Peppers' Collective Action counsel held a teleconference to discuss the litigation and a strategy for the case moving forward, including a mediation plan. During that call, among other things, Carrick reconfirmed Zurich would be covering Jose Peppers' Collective Action defense costs.

28.     That same day, Jose Peppers' Collective Action counsel sent Carrick an updated written case assessment detailing the posture of the litigation as it stood on March 18, 2021, including a substantive evaluation of the claims included in the Amended Complaint for further review and discussion in defense of the case.

1728234v3

29.     Collective Action counsel also worked with Carrick to schedule mediation and to arrange for Carrick's attendance at the mediation on April 6, 2021.

30.     Jose Peppers submitted additional defense cost invoices to Carrick on April 1, 2021, and Carrick's office responded in writing that the invoices would be submitted for payment.

31.     On April 6, 2021, Florece, Jose Peppers, and Zurich (through Carrick) participated in a mediation in an attempt to resolve the Collective Action.

32.     In connection with the mediation, counsel for Florece submitted an expert damage report setting forth damages in excess of $12,000,000. Zurich offered to contribute up to $50,000 to the settlement demand. The Collective Action did not settle during the April 6, 2021 mediation, but the parties continued to negotiate.

33.     After continued negotiations, Florece and Jose Peppers ultimately agreed on a settlement figure within the policy limits. However, despite Zurich participating in the defense of the lawsuit as well as the mediation on April 6, 2021, offering to contribute to the original settlement demand, and being kept well-apprised of continued negotiation efforts, Zurich suddenly went silent and stopped responding to attempts to discuss settlement.

34.     As the negotiations progressed, Jose Peppers' counsel sent a letter to Carrick on April 21, 2021, demanding that Zurich accept and pay Florece's settlement demand which was now within policy limits.

35.     Jose Peppers' correspondence emphasized that given the Plaintiffs' expert's evaluation of damages, the potential exposure to Jose Peppers at trial was well outside of the policy limits, leaving Jose Peppers vulnerable to a catastrophic excess judgment.

36.     Jose Peppers received no response to the April 21, 2021 letter.

37.     Jose Peppers' counsel repeatedly attempted to contact Carrick regarding the imminent deadline to accept the settlement, including but not limited to by phone message on April 23, emails on April 26 and 27, a phone conference on April 28, a phone conference on April 29, a follow-up letter to Carrick on May 4, and emails to Carrick on May 6, 10 and 11, 2021.

38.     Zurich's response to the demand did not come until May 12, 2021,[1] at which time Carrick - *for the first time* - informed Jose Peppers that there was no coverage available for the Collective Action (the "Denial Letter").

39.     The Denial Letter came nearly a year after Jose Peppers first submitted the Claim to Zurich. During that time, Zurich never issued a reservation of rights letter or otherwise informed Jose Peppers that there may not be coverage for the Claim. Instead, Zurich actively participated in the defense of the lawsuit and also promised to pay defense costs on multiple occasions.

40.     Until Jose Peppers received the Denial Letter, it believed Zurich had accepted coverage and planned to defend and indemnify Jose Peppers based on Carrick's continued participation in the litigation and the fact Zurich failed to issue a denial and/or reservation of rights letter, and Jose Peppers relied on Zurich's actions and representations in defending the case.

41.     Further, until Jose Peppers received the Denial Letter, Jose Peppers relied on Carrick's representations that Zurich would pay its defense costs.

42.     In response to the sudden denial of coverage after ten months of litigation and after mediation, Jose Peppers' counsel immediately scheduled a phone conference with Carrick on May 13, 2021.  On May 17, 2021, Jose Peppers' counsel followed up by letter and again demanded Zurich reconsider the denial and agree to pay the mediator's settlement number, which, like the

---

[1] The declination letter is dated May 5, but it was not sent to Jose Peppers or its counsel until May 12, 2021.  The letter was delivered via email.

1728234v3

*Clerk of the District Court, Johnson County Kansas*
*10/07/21  04:38pm NG*

April 21, 2021 demand, was within the policy limits. Jose Peppers' counsel further informed Zurich that the settlement offer expired on May 21, 2021, and that time was of the essence.

43.     Zurich did not respond to the May 17, 2021 demand letter.

44.     Collective Action counsel followed up with Carrick again on May 20, 2021, to attempt to discuss the looming settlement demand and to demand Zurich accept the settlement. Again, Zurich did not respond.

45.     Jose Peppers was ultimately forced to settle the Collective Action for $1,750,000 without any contribution or response from Zurich whatsoever.

46.     Jose Peppers sent a final demand on July 30, 2021, for coverage and defense costs in connection with the Collective Action, and further demanded that Zurich submit to mediation pursuant to the Policy.

47.     The parties engaged in pre-suit mediation on September 28, 2021, as required under the Policy, but the parties did not reach a resolution.

48.     To date, Zurich has damaged Jose Peppers in the amount of $1,750,000 in settlement costs and in excess of $200,000 in attorneys' fees.

### COUNT I – BREACH OF CONTRACT
(Plaintiffs v. Zurich)

49.     Plaintiffs reallege and reincorporate all the allegations contained in the preceding paragraphs as though fully set forth herein.

50.     Zurich undertook an obligation to defend the Collective Action, and to settle the action within policy limits when it was reasonable to do so, and when an opportunity for such settlement existed.

51.     Zurich breached the Policy issued to Jose Peppers by refusing and failing to perform its duty to defend Jose Peppers with respect to the Collective Action, and by refusing and failing

to settle the Collective Action within policy limits when the opportunity for such a settlement existed.

52.     In the Collective Action, Florece offered to settle all claims against Jose Peppers within policy limits. Zurich failed to negotiate, contribute, or respond in any way or even acknowledge the settlement offers.

53.     Instead, Zurich, for the first time, took the position that there was no coverage for the Claim and ceased communicating with Jose Peppers.

54.     Jose Peppers satisfied all conditions precedent to the Policy.

55.     Zurich did not.

56.     Zurich breached the Policy and its promises and obligations to Jose Peppers by engaging in some or all of the following acts or omissions:

A.     Zurich refused and failed to fulfill its obligation to defend Jose Peppers. Zurich confirmed on multiple occasions its commitment to pay Jose Peppers' defense counsel invoices once Jose Peppers exceeded its SIR. However, almost a year after the Collective Action was filed and only after mediation occurred and a settlement demand was made within policy limits did Zurich refuse to pay for Jose Peppers' defense costs. In refusing to defend Jose Peppers, Zurich deprived Jose Peppers of its benefits under the Policy, including the benefit of a defense.

B.     Zurich, with full knowledge of the catastrophic effect a large judgment in excess of the policy limits would have on Jose Peppers and Gieselman, and with complete disregard for the likelihood of such a judgment occurring, refused and failed to settle within the policy limits despite having multiple opportunities to do so. Zurich, in refusing to accept or advance any settlement opportunities, deprived Jose Peppers of its benefits under

the Policy, including the benefit of Jose Peppers to consider settlement of the action to avoid the possibility of catastrophic excess liability falling upon Jose Peppers. Instead, Zurich refused to settle and further denied coverage despite actively participating in the defense of the Collective Action for nearly a year.

C.      Zurich was fully aware of Jose Peppers' interests in avoiding the catastrophic effect of a judgment far in excess of the policy limits and that such a judgment was likely, but nevertheless failed and refused to settle the action. Zurich did not consider Jose Peppers' interest in avoiding an excess judgment to be as important as Zurich's own interest in attempting to absolve itself of any liability by denying coverage to Jose Peppers. This apportionment of relative interests was the motivation behind Zurich's decision to gamble with Jose Peppers' rights.

D.      Zurich never issued a timely and proper reservation of rights letter or denial of coverage. Zurich is estopped from denying Jose Peppers' demand for defense and indemnity and has otherwise waived its right to deny coverage of the Claim as Jose Peppers relied on the multiple representations and actions of Zurich and its agents to conclude that coverage was available, and that Zurich would pay Jose Peppers' defense costs associated with the Collective Action. Rather than issuing a proper and timely reservation of rights letter or indicating in any way that it intended to eventually deny coverage, Zurich actively participated in the defense of the Collective Action for nearly a year. As a result, Jose Peppers justifiably relied on Zurich's representations to its detriment.

E.      Zurich knew, or in the exercise of reasonable care in investigation should have known, there was a considerable risk that Jose Peppers would be found liable and that the resultant damages would dramatically exceed the policy limits. Despite the existence

of facts indicating a large excess judgment was likely, Zurich did not settle the action despite having multiple opportunities to do so, refused to respond to Jose Peppers' multiple attempts to discuss the settlement demands and coverage issues, and ultimately forced Jose Peppers to settle the litigation without Zurich's contribution.

   F. As a direct and proximate result of Zurich's acts, commissions, omissions, and conduct, which occurred without just cause or excuse, Jose Peppers has been deprived the benefit of insurance coverage for which Jose Peppers paid premiums, and has sustained actual damage in excess of $1,900,000.

WHEREFORE, Plaintiffs Jose Pepper's Restaurants, LLC and Edward Gieselman respectfully request judgment in their favor and against defendant Zurich American Insurance Company, for an award of damages in an amount exceeding $1,900,000 plus interest at the highest allowable rate, attorneys' fees, costs, and such further relief as the Court deems just and equitable under the circumstances.

## COUNT II – PROMISSORY ESTOPPEL
### (Plaintiffs v. Zurich)

   57. Plaintiffs reallege and reincorporate all the allegations contained in the preceding paragraphs as though fully set forth herein.

   58. Zurich undertook an obligation to defend the Collective Action, and to settle the action within policy limits when it was reasonable to do so, and when an opportunity for such settlement existed.

   59. Jose Peppers tendered the Collective Action to Zurich for defense and indemnity pursuant to the Policy, and Zurich assigned Carrick as Jose Peppers' claims representative.

60.    Zurich never issued a timely and proper reservation of rights letter or otherwise denied coverage until nearly a year after Jose Peppers originally tendered the Collective Action to Zurich.

61.    For nearly a year, Jose Peppers relied on Carrick's direct statements, Zurich's active participation in the litigation, and the glaring lack of a denial or reservation of rights letter to form its belief that Zurich would defend and indemnify Jose Peppers and Gieselman under the Policy.

62.    For nearly a year, Zurich actively participated in the defense of the lawsuit, assisted with the mediation, and promised to pay Jose Peppers' and Gieselman's defense costs.

63.    Then, after Jose Peppers and Florece finally agreed to a settlement figure within the policy limits, Zurich ceased all communication with Jose Peppers, refused to pay defense costs, and refused to settle the Collective Action within policy limits despite having multiple opportunities to do so.

64.    Florece offered to settle all claims against Jose Peppers within policy limits. Zurich failed to negotiate, contribute, or respond in any way or even acknowledge the settlement offers.

65.    Instead, Zurich, for the first time, took the position that there was no coverage for the Claim and ceased communicating with Jose Peppers.

66.    Jose Peppers and Gieselman relied upon Zurich's representations that it would defend and indemnify Jose Peppers to its detriment.

67.    For nearly a year, Jose Peppers' strategy with respect to litigation, defense, and settlement of the Collective Action was reliant upon Zurich's representations and actions, and Jose Peppers believed its maximum exposure in the litigation was its $50,000 SIR; therefore, Jose Peppers did not consider early resolution of this matter and the case proceeded to active litigation with expanded and increased claims that exponentially elevated Jose Peppers' potential damages.

68.     Had Zurich denied coverage, denied defense costs, or issued a timely and proper reservation of rights letter – a standard practice within the insurance industry and as required by law – Jose Peppers would not have incurred the defense costs and settlement expense Zurich now refuses to pay.

69.     Zurich must now be estopped from denying coverage under the Policy and paying defense costs, as:

A.     Zurich actively participated in defending the claim as though coverage existed and accordingly promised and confirmed on multiple occasions its commitment to pay Jose Peppers' defense costs once Jose Peppers exceeded its SIR. However, nearly a year after the Collective Action was filed and only after a settlement demand was made did Zurich deny coverage.

B.     Zurich was fully aware of Jose Peppers' interests in avoiding the catastrophic effect of a judgment far in excess of the policy limits and that the risks of such a judgment were high, but nevertheless failed and refused to settle the action. Zurich did not consider Jose Peppers' interest in avoiding an excess judgment to be as important as Zurich's own interest in attempting to absolve itself of any liability by denying coverage to Jose Peppers. This apportionment of relative interests was the motivation behind Zurich's decision to gamble with Jose Peppers' rights.

C.     Zurich is estopped from denying Jose Peppers' demand for defense and indemnity and has otherwise waived its right to deny coverage of the Claim, as Jose Peppers relied on the multiple representations, actions, inactions, and promises of Zurich and its agents to conclude that coverage was available and that Zurich would pay Jose Peppers' defense costs associated with the Collective Action. Moreover, Zurich never

issued a timely and proper reservation of rights letter or otherwise suggested to Jose Peppers that it was denying the Claim for nearly a year after the Claim was filed and only after mediation had been conducted; consequently, Jose Peppers relied on such representations and the lack of reservation of rights or denial letter to its detriment.

        D.     Zurich should have expected Jose Peppers to rely on its actions, representations, and promises to defend and indemnify Jose Peppers.

        E.     Enforcement of Zurich's representations that it would pay for the cost of defense of the Collective Action and otherwise defend and indemnify Jose Peppers with respect to the Collective Action under the Policy is the only means to cure the injustice of Zurich's breach of its promises and representations to Jose Peppers.

WHEREFORE, Plaintiff Jose Pepper's Restaurants, LLC and Edward Gieselman respectfully request judgment in their favor and against defendant Zurich American Insurance Company, for an award of damages in an amount exceeding $1,900,000, plus interest at the highest allowable rate, attorneys' fees, costs, and such further relief as the Court deems just and equitable under the circumstances.

## COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Gieselman v. Zurich)

70.    Plaintiffs reallege and reincorporate all the allegations contained in the preceding paragraphs as though fully set forth herein.

71.    Zurich undertook an obligation to defend the Collective Action, and to settle the action within policy limits when it was reasonable to do so, and when an opportunity for such settlement existed.

72.     Jose Peppers, which included Mr. Gieselman as an insured under the Policy, tendered the Collective Action to Zurich for defense and indemnity pursuant to the Policy, and Zurich assigned Carrick as Jose Peppers' claims representative.

73.     Zurich never issued a reservation of rights letter or otherwise denied coverage until nearly a year after Jose Peppers originally tendered the Collective Action to Zurich.

74.     For nearly a year, Mr. Gieselman relied on Carrick's direct statements, Zurich's active participation in the litigation, and the glaring lack of a denial or reservation of rights letter to form its belief that Zurich would defend and indemnify Jose Peppers, including Mr. Gieselman, under the Policy.

75.     For nearly a year, Zurich actively participated in the defense of the lawsuit, assisted with the mediation, and promised to pay defense costs.

76.     During this time, Mr. Gieselman was undergoing follow-up care for cancer, which required him to travel between Kansas and Texas while also being actively involved in the Collective Action defense.  The Collective Action was potentially company-ending litigation for Jose Peppers given the amount at stake (in excess of $12 million) and would result in loss of hundreds of jobs in the Kansas City area as well as the end and loss of Mr. Gieselman's entire business.

77.     After Florece finally demanded a settlement figure within the policy limits, Zurich ceased all communication with Jose Peppers, refused to pay Jose Peppers' defense costs, and refused to settle the Collective Action within policy limits despite having multiple opportunities to do so.

78.     Florece offered to settle all claims against Jose Peppers within policy limits. Zurich failed to negotiate, contribute, or respond in any way or even acknowledge the settlement offers.

79.     Instead, Zurich, for the first time, took the position that there was no coverage for the Claim and ceased communicating with Jose Peppers.

80.     Mr. Gieselman relied upon Zurich's representations that it would defend and indemnify Jose Peppers.

81.     For nearly a year, Jose Peppers' and Mr. Gieselman's strategy with respect to litigation, defense, and settlement of the Collective Action was reliant upon Zurich's representations and actions, and Jose Peppers and Mr. Gieselman believed the maximum exposure in the litigation was the $50,000 SIR; therefore, Jose Peppers and Mr. Gieselman did not consider early resolution of this matter and the case proceeded to active litigation with expanded and increased claims that exponentially elevated Jose Peppers' potential damages.

82.     The stress of continued, complex litigation requiring extensive involvement by Mr. Gieselman as a named plaintiff in the Collective Action as well as the owner of Jose Peppers took an extreme mental and emotional toll on him.

83.     Had Zurich denied coverage, denied defense costs, or issued a timely and proper reservation of rights letter – a standard practice within the insurance industry and as required by law – Mr. Gieselman would not have incurred the extreme and long-lasting stress and mental and emotional anguish that he suffered during the course of litigating the Collective Action.

84.     Zurich's conduct, including but not limited to making direct statements, actively participating in the litigation, and representing that it would pay legal bills for Jose Peppers, and then inexplicably "going silent," suddenly denying coverage, and forcing Mr. Gieselman to settle this large claim without Zurich in order to save his business caused Mr. Gieselman's severe and long-lasting mental distress and anguish.  Jose Peppers and Mr. Gieselman were forced to pay out-

of-pocket for a settlement which Zurich – for nearly a year – represented it was defending and indemnifying on their behalf.

85.     But for Zurich's conduct, Mr. Gieselman would not have sustained such mental distress and anguish.

WHEREFORE, Plaintiff Edward Gieselman respectfully requests judgment in his favor and against defendant Zurich American Insurance Company, for an award of damages in an amount exceeding $1,900,000, plus interest at the highest allowable rate, attorneys' fees, costs, and such further relief as the Court deems just and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs Jose Pepper's Restaurants and Edward Gieselman, by and through counsel, hereby demand a trial by jury on all so triable matters.

Respectfully submitted,

SEIGFREID BINGHAM, P.C.

/s/ Shannon D. Johnson
Shannon Johnson (KS #23496)
Julie E. Parisi (KS # 25991)
2323 Grand Boulevard, Ste. 1000
Kansas City, MO 64108
Phone: (816) 421-4460
Fax: (816) 474-3447
Email: sjohnson@sb-kc.com
           jparisi@sb-kc.com





Dear Policyholder,

Thank you for choosing Zurich for your Management Liability Product(s).  We truly appreciate your business and welcome the opportunity to work with you.

We wanted to inform you that under the terms of this transaction you are entitled to online services and resources that are designed just for management solutions customers.  These resources are available at no additional cost to you and include loss mitigation tips and techniques, industry-related articles and more. Here are just some examples of what is available to you:

- **eDiscovery website** – a real-time information tool, including a readiness assessment for this rapidly growing phenomena
- **Thought leadership materials** – dedicated to your top-of-mind needs, including timely webinars and engaging white papers, even specific to your industry segment
- **Security & Privacy readiness self assessment** – this exposure makes headlines daily.  How ready is your organization for this fast-growing threat?
- **Strategic Risk Services and Enterprise Risk Management** – on-line information source for related hot topics and ERM videos to minimize barriers to achieving expected business outcomes

To access this information and all other resources, simply visit www.ZurichMgmtSolutions.com.  Please be sure to have your policy number handy.

***Deliver for our customers when it matters most***. At Zurich, that's the promise we make every day.  I thank you again for choosing Zurich.

Sincerely,

*Brian F. Winters*

Brian Winters
Head of Specialty Products

© 2011 Zurich American Insurance Company. All rights reserved.



# Important Notice - In Witness Clause

In return for the payment of premium, and subject to the terms of this policy, coverage is provided as stated in this policy.

IN WITNESS WHEREOF, this Company has executed and attested these presents and, where required by law, has caused this policy to be countersigned by its duly Authorized Representative(s).

**President**                                              **Corporate Secretary**

---

**QUESTIONS ABOUT YOUR INSURANCE?**   Your agent or broker is best equipped to provide information about your insurance.   Should you require additional information or assistance in resolving a complaint, call or write to the following (please have your policy or claim number ready):

Zurich in North America
Customer Inquiry Center
1299 Zurich Way
Schaumburg, Illinois 60196-1056
**1-800-382-2150** (Business Hours:  8 a.m. - 4 p.m. [CT])
**Email:** info.source@zurichna.com

---

*Clerk of the District Court, Johnson County Kansas*
*10/07/21  04:38pm NG*



**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY.**

**THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS
AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE OF PREMIUM
# (RELATING TO DISPOSITION OF TRIA)

### SCHEDULE*

| |
|---|
| **(1)**  Premium attributable to risk of loss from certified acts of terrorism for lines of insurance subject to TRIA: |

**$0**

If TRIA terminates, the portion of this premium attributable to the remaining part of the policy period, as modified by any change shown in **(2)** of this Schedule, applies to the risk of loss from terrorism after the termination of TRIA.

**(2)**  Premium change upon termination of TRIA or upon applicability of a Conditional Endorsement:

No change unless one of the following is completed -

Return Premium:   **N/A**

Additional Premium:   **N/A**

If we notify you of an additional premium charge, the additional premium will be due as specified in such notice.

*Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

## A.  Disclosure of Premium

In accordance with the federal Terrorism Risk Insurance Act ("TRIA"), as amended, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to the risk of loss from terrorist acts certified under that Act for lines subject to TRIA. That portion of your premium attributable is shown in the Schedule above, but may be subject to adjustment upon premium audit, if applicable.

## B.  Disclosure of Federal Participation in Payment of Terrorism Losses

The United States Government may pay a share of insured losses resulting from an act of terrorism. The federal share will decrease by 5% from 85% to 80% over a five-year period while the insurer share increases by the same amount during the same period. The schedule below illustrates the decrease in the federal share:

January 1, 2015 – December 31, 2015 federal share: 85%

January 1, 2016 – December 31, 2016 federal share: 84%

January 1, 2017 – December 31, 2017 federal share: 83%

January 1, 2018 – December 31, 2018 federal share: 82%

January 1, 2019 – December 31, 2019 federal share: 81%

January 1, 2020 – December 31, 2020 federal share: 80%

*Clerk of the District Court, Johnson County Kansas*
*10/07/21  04:38pm NG*

## C. Disclosure of $100 Billion Cap on All Insurer and Federal Obligations

If aggregate insured losses attributable to terrorist acts certified under TRIA exceed $100 billion in a calendar year (January 1 through December 31) and an insurer has met its deductible under the program, that insurer shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

## D. Availability

As required by TRIA, we have made available to you for lines subject to TRIA coverage for losses resulting from acts of terrorism certified under TRIA with terms, amounts and limitations that do not differ materially from those for losses arising from events other than acts of terrorism.

## E. Definition of Act of Terrorism under TRIA

TRIA defines "act of terrorism" as any act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act ("TRIA"), to be an act of terrorism. The Terrorism Risk Insurance Act provides that the Secretary of Treasury shall certify an act of terrorism:

1. To be an act of terrorism;

2. To be a violent act or an act that is dangerous to human life, property or infrastructure;

3. To have resulted in damage within the United States, or outside of the United States in the case of an air carrier (as defined in section 40102 of Title 49, United States Code) or a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), or the premises of a United States mission; and

4. To have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

No act may be certified as an act of terrorism if the act is committed as part of the course of a war declared by Congress (except for workers' compensation) or if losses resulting from the act, in the aggregate for insurance subject to TRIA, do not exceed $5,000,000.

## F. Possibility of Additional or Return Premium

The federal program established under TRIA is scheduled to terminate at the end of December 31, 2020 unless extended by the federal government. The premium attributable to the risk of loss from certified acts of terrorism coverage is calculated based on the coverage (if any) in effect at the beginning of your policy for certified acts of terrorism.  If your policy contains a Conditional Endorsement, the termination of TRIA or extension of the federal program with certain modifications (as explained in that endorsement) may modify the extent of coverage (if any) your policy provides for terrorism. If TRIA terminates or the Conditional Endorsement becomes applicable to your policy, the return premium (if any) or additional premium (if any) shown in **(2)** of the Schedule will apply. If the level or terms of federal participation change, the premium shown in **(1)** of the Schedule attributable to that part of the policy period extending beyond such a change may not be appropriate and we will notify you of any changes in your premium.

Includes copyrighted material of ISO Properties, Inc. with its permission.
Copyright Zurich American Insurance Company 2019

# Disclosure Statement



It is our pleasure to present the enclosed policy to you
for presentation to your customer.

**INSTRUCTION TO AGENT OR BROKER:**

WE REQUIRE THAT YOU TRANSMIT THE ATTACHED/ENCLOSED DISCLOSURE STATEMENT TO THE CUSTOMER
WITH THE POLICY.

Once again, thank you for your interest, and we look forward to meeting your needs and those of your customers.

# Disclosure Statement



**NOTICE OF DISCLOSURE FOR AGENT & BROKER COMPENSATION**

If you want to learn more about the compensation Zurich pays agents and brokers visit:

http://www.zurichnaproducercompensation.com

or call the following toll-free number:  (866) 903-1192.

This Notice is provided on behalf of Zurich American Insurance Company

and its underwriting subsidiaries.

# Private Company Select Insurance Policy Declarations


**ZURICH**®

Insurance is provided by:

Zurich American Insurance Company
1299 Zurich Way
Schaumburg, Illinois 60196-1056

**THE LIABILITY COVERAGE PARTS, IF PURCHASED, ARE ON A CLAIMS MADE AND REPORTED BASIS AND COVER ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR THE EXTENDED REPORTING PERIOD OR RUN-OFF COVERAGE PERIOD, IF EXERCISED, AND REPORTED TO THE UNDERWRITER AS REQUIRED BY THIS POLICY. THE LIMITS OF LIABILITY AND ANY RETENTION SHALL BE REDUCED BY AMOUNTS INCURRED AS DEFENSE COSTS. PLEASE READ THIS POLICY CAREFULLY.**

Policy Number: MPL 0239201-02

Item 1. **Policyholder** and Mailing Address:   JOSE PEPPER'S RESTAURANTS, LLC
10540 MARTY ST
STE 100
OVERLAND PARK, KS 66212

Item 2. Combined Aggregate Limit of Liability:   $5,000,000   All **Loss** under all Coverage Parts, combined, other than the Crime Coverage Part.

Item 3. **Policy Period**:   From:  12:01 A.M. on 04/01/2020   To:  12:01 A.M. on 04/01/2021
Local time at the address shown in Item 1.

Item 4. A. **Extended Reporting Period**:   1. Additional Premium:   N/A of Annual Premium

2. Additional Period:   N/A

B. **Run-Off Coverage Period**:   1. Additional Premium:   N/A of Annual Premium

2. Additional Period:   N/A

Item 5. Notice to Underwriter:

A. Address for Notice of **Claim**, Potential **Claim** or **Coverage Event**:

Attn:  Zurich North America - Management Solutions Claims   Fax:   (866) 255-2962
P.O. Box 968041                                              E-mail: msgclms@zurichna.com
Schaumburg, IL 60196-8041

B. Address for Notice of loss or situation under Crime Coverage Part:

Attn:  Zurich North America - Fidelity and Crime Bonds Claims   Fax:   (877) 812-5754
P.O. Box 968036                                                 E-mail: reportsfclaims@zurichna.com
Schaumburg, IL 60196

C. Address for All Other Notices:

Attn:  Zurich North America                     Fax:   (866) 240-0155
Management Solutions Group                      E-mail: usz_zip@zurichna.com
4 World Trade Center, 150 Greenwich St
New York, NY 10007

*Clerk of the District Court, Johnson County Kansas*
*10/07/21  04:38pm NG*

Item 6.   Coverage Schedule:

This policy includes only those Coverage Parts or coverages designated below by "X" as purchased.  If a Coverage Part or coverage is not expressly designated as purchased, this policy does not include such Coverage Part or coverage.

| | Coverage Part | Purchased/ Granted | Coverage Part Limit of Liability | Retention[1] | Pending or Prior Date |
|---|---|---|---|---|---|
| **A.** | Management and Company Liability | | | | |
| | 1. Insuring Clause A Insured Person Liability<br><br>2. Insuring Clause B Company Reimbursement<br><br>3. Insuring Clause C Company Liability | ☐ Yes  ☒ No | $ N/A Aggregate Limit of Liability | $ N/A Each **Claim** | |
| | 4. Insuring Clause D Retired Independent Directors Liability | ☐ Yes  ☒ No | $ N/A Each **Retired Independent Director** for All **Claims**, subject to $ N/A Aggregate Limit of Liability for All **Retired Independent Directors** All **Claims** | | |
| **B.** | Employment Practices and Third Party Discrimination Liability | ☒ Yes  ☐ No | $4,000,000 Aggregate Limit of Liability<br><br>$4,000,000 Aggregate Sublimit for all **Third Party Discrimination Claims** | $50,000 Each **Employment Practices Claim**<br><br>$50,000 Each **Third Party Discrimination Claim** | 09/23/2008<br><br>09/23/2008 |
| **C.** | Fiduciary Liability | ☐ Yes  ☒ No | $ N/A Aggregate Limit of Liability | $ N/A Each **Claim** | |
| **D.** | Crime | ☐ Yes  ☒ No | See Crime Coverage Part Supplemental Declarations | | None |

[1]No Retention shall apply to non-indemnifiable **Loss** incurred by **Insured Persons** under any **Liability Coverage Part** except as required by state law.

*Clerk of the District Court, Johnson County Kansas*
*10/07/21  04:38pm NG*

Item 6.    Coverage Schedule (continued):

Liability Coverage Parts which share Limit of Liability:

☐  A.  Management and Company Liability

☐  B.  Employment Practices and Third Party Discrimination Liability

☐  C.  Fiduciary Liability

☒  D.  None

Item 7.    Additional Limit of Liability for **Defense Costs**:     $1,000,000

Item 8.    Policy Premium:   $ 38,764.00

Item 9.    Endorsements Effective at Inception:     See attached Schedule

*Clerk of the District Court, Johnson County Kansas*
*10/07/21  04:38pm NG*

# Private Company Select Insurance Policy Form and Endorsement Schedule



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| MPL 0239201-02 | 04/01/2020 | 04/01/2021 | 04/01/2020 | | |

**Policyholder:**   JOSE PEPPER'S RESTAURANTS, LLC

| Form Name | Form Number | Edition Date | Endorsement No. |
|---|---|---|---|
| Important Notice - In Witness Clause | U-GU-319-F | (01/09) | |
| Disclosure of Premium (Relating to Disposition of TRIA) | U-GU-692-D CW | (01/20) | |
| Private Company Select Insurance Policy Declarations | U-PCL-D-100-B CW | (06/10) | |
| Private Company Select Insurance Policy General Terms and Conditions | U-PCL-110-B CW | (06/10) | |
| Private Company Select Insurance Policy Employment Practices and Third Party Discrimination Liability Coverage Part | U-PCL-130-A CW | (09/09) | |
| Lay-Off Sublimit Amended | U-PCL-2038E CW | (01/18) | 01 |
| Private Select Plus Endorsement (Crisis Management) | U-PCL-206-B CW | (10/15) | 02 |
| IRCA Claims Endorsements | U-PCL-227-A CW | (05/10) | 03 |
| Pending and Prior Litigation Exclusion (Increased Limits) | U-PCL-852-A CW | (10/15) | 04 |
| Specific Claim/Litigation Exclusion | N-PCL-3010M CW | (05/15) | 05 |
| Wholesale Broker Enhancement Amendatory Endorsement | N-PCL-3216M CW | (01/20) | 06 |
| Additional Insured Amended (Pending & Prior Date) | N-PCL-200M CW | (07/17) | 07 |
| Defense and Settlement Amended (Optional Election of Duty to Defend) | N-PCL-2043G CW | (07/17) | 08 |
| Preamble of Exclusions Amended (Portion of Loss) | N-PCL-2075M CW | (07/17) | 09 |
| Sanctions Exclusion Endorsement | U-GU-1191-A CW | (03/15) | 10 |
| Kansas Amendatory Endorsement | U-PCL-212-B KS | (01/17) | 11 |
| Cap on Losses From Certified Acts of Terrorism | U-GU-767-B CW | (01/15) | 12 |

*Clerk of the District Court, Johnson County Kansas*
*10/07/21  04:38pm NG*

# Private Company Select Insurance Policy
# General Terms and Conditions



**TABLE OF CONTENTS**

Page

I. TERMS AND CONDITIONS .................................................................................................................2

II. GENERAL DEFINITIONS ..................................................................................................................2

III. LIMITS OF LIABILITY, RETENTION AND SINGLE CLAIMS.............................................................5

IV. LIABILITY COVERAGE PART EXTENSIONS ..................................................................................6

V. ALLOCATION....................................................................................................................................7

VI. CHANGES IN EXPOSURE................................................................................................................8

VII. DEFENSE AND SETTLEMENT ........................................................................................................9

VIII. REPORTING AND NOTICE...............................................................................................................9

IX. REPRESENTATIONS, SEVERABILITY AND NON-RESCINDABLE COVERAGES .........................10

X. TERRITORY AND VALUATION........................................................................................................10

XI. OTHER INSURANCE .......................................................................................................................11

XII. SUBROGATION ...............................................................................................................................11

XIII. ALTERATION, ASSIGNMENT AND HEADINGS .............................................................................11

XIV. PAYMENT PRIORITY ......................................................................................................................11

XV. POLICY TERMINATION AND NONRENEWAL................................................................................11

XVI. AUTHORIZATION CLAUSE.............................................................................................................12

XVII. BANKRUPTCY.................................................................................................................................12

XVIII. ALTERNATIVE DISPUTE RESOLUTION ........................................................................................12

# Private Company Select Insurance Policy
# General Terms and Conditions



In consideration of payment of the premium and in reliance upon the statements made in the **Application**, which is made a part hereof, and subject to the Declarations and the definitions, exclusions, limitations, conditions, provisions and other terms of this policy (including any endorsements hereto), the Underwriter and the **Insureds** agree as follows:

I.   TERMS AND CONDITIONS

This policy is comprised of these General Terms and Conditions, the Declarations, various Coverage Parts and endorsements, if applicable, and the **Application**.  Although various Coverage Parts may be referenced in this policy, a Coverage Part is included within this policy and affords coverage only if that Coverage Part is designated as being purchased in the Coverage Schedule in Item 6 of the Declarations.

Except for these General Terms and Conditions or unless stated to the contrary in any Coverage Part or endorsement, the terms and conditions of each Coverage Part of this policy apply only to that Coverage Part and shall not apply to any other Coverage Part of this policy.  Any defined term referenced in the General Terms and Conditions but defined in a Coverage Part shall, for purposes of coverage under that Coverage Part, have the meaning set forth in that Coverage Part.  If any provision in the General Terms and Conditions is inconsistent or in conflict with the terms and conditions of any Coverage Part, the terms and conditions of such Coverage Part shall control for purposes of that Coverage Part.

II.  GENERAL DEFINITIONS

When used in this policy, the following terms, whether in the singular or plural, are defined as follows:

A.   **Application** means:

1.   all materials and information, including all signed applications and any materials attached thereto or incorporated therein, submitted by or on behalf of the **Insureds** to the Underwriter in connection with the underwriting of this policy or any policy issued by the Underwriter of which this policy is a direct or indirect renewal or replacement; and

2.   all publicly available documents prepared by the **Company** which are reviewed by the Underwriter in connection with the underwriting of this policy or any policy issued by the Underwriter of which this policy is a direct or indirect renewal or replacement.

The **Application** is deemed attached to and incorporated into this policy.

B.   **Claim** means, with respect to any **Liability Coverage Part**, those demands, proceedings, investigations and other matters defined as a **Claim** in such Coverage Part.

C.   **Company** means, collectively, the **Policyholder** and its **Subsidiaries**, including any such organization as a debtor in possession under United States bankruptcy law or an equivalent status under the law of any other country.

D.   **Coverage Event** means, with respect to a **Non-Liability Coverage Part**, the event or loss which must occur or be sustained or discovered in order to invoke coverage under such Coverage Part.

E.   **Defense Costs** means that part of **Loss** consisting of reasonable costs, charges, fees (including but not limited to attorney's fees and expert's fees) and expenses (other than regular or overtime wages, salaries or fees of the directors, officers or employees of the **Company**) incurred by the **Insureds** (i) in defending or investigating **Claims**, including costs assessed against the **Insureds** in a **Claim** or the premium for appeal, attachment or similar bonds, provided the Underwriter shall have no obligation to apply for or furnish such bonds, or (ii) at the Underwriter's request to assist the Underwriter in investigating a **Claim**.

F.   **Domestic Partner** means any natural person qualifying as a domestic partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Company**.

G.   **Employee** means the following:

1.   any natural persons in the regular service of the **Company** in the ordinary course of the **Company's** business and whom the **Company** compensates by salary, wages and/or commissions and has the right to govern and direct in the performance of such service, including any such natural persons who are leased, temporary, part-time or seasonal employees of the Company;

2.   any natural person independent contractors who are treated under applicable law as employees of the **Company**; and

3.   any volunteers of the **Company**;

provided any coverage for any such leased employees or independent contractors shall be specifically excess of any indemnification or insurance otherwise available to such leased employees or independent contractors from the applicable leasing company or any other source.

H.   **Employment Practices Claim** means a **Claim** which is brought and maintained by or on behalf of any past, present, future or prospective **Employee(s)** of the **Company** against any **Insured** for any **Wrongful Act** in connection with any actual or alleged:

1.   breach of any express or implied employment contract;

2.   violation of any law or public policy concerning discrimination in employment whether based upon race, national origin, religion, sex, age, sexual preference, marital status, disability, medical leave or genetic predisposition;

3.   employment-related torts including without limitation wrongful termination, failure or refusal to hire or promote; wrongful discipline; wrongful reference, deprivation of a career opportunity, demotion or adverse change in terms, conditions or status of employment; wrongful failure to grant tenure; humiliation; retaliation for asserting a legal right; workplace harassment including without limitation offensive, intimidating, coercive or unwelcome conduct, advances, contact or communications; negligent hiring, retention, supervision, training or performance evaluation; and employment-related misrepresentation, defamation, invasion of privacy or infliction of emotional distress.

I.   **Environmental Event** means:

1.   the actual, alleged or threatened discharge, release, escape, seepage, migration or disposal of **Pollutants** or **Greenhouse Gases** into or on real or personal property, water or the atmosphere; or

2.   any direction or request that the **Company** or the **Insured Persons** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants** or **Greenhouse Gases**, or any voluntary decision to do so,

whether or not such **Greenhouse Gases** are **Pollutants**.

J.   **ERISA** means the Employee Retirement Income Security Act of 1974, as amended.

K.   **Executive Officers** means with respect to any **Company** its chair, president, chief executive officer, chief financial officer, in-house general counsel, and solely with respect to the Employment Practices Liability Coverage Part, if purchased, the human resource manager, or, if a **Company** does not have one of such positions, any equivalent executive position in such **Company**.

L.   **Extended Reporting Period** means the period of the extended coverage under the **Liability Coverage Parts**, as set forth in Item 4.A of the Declarations.

M.   **Extradition** means any formal process by which an **Insured Person** located in any country is or is sought to be surrendered to any other country for trial, or otherwise to answer any criminal accusation, for a **Wrongful Act**.

N.   **Financial Impairment** means the status of the **Company** resulting from the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the **Company**, or the **Company** becoming a debtor in possession.

O.   **Greenhouse Gases** means carbon dioxide (CO2), methane (CH4), nitrous oxide (N20), hydrofluorocarbons (HFCs), perfluorocarbons (PFCs), and sulphur hexafluoride (SF6), or any other emission or substance defined by applicable law as a Greenhouse Gas.

P.   **Insured Persons** means with respect to each Coverage Part the natural persons defined as **Insured Persons** in such Coverage Part.

Q.   **Insureds** means with respect to each Coverage Part the entities, plans and natural persons defined as **Insureds** in such Coverage Part.

R.   **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes.

S.   **Liability Coverage Part** means any of the following: the Management and Company Liability Coverage Part, the Employment Practices and Third Party Discrimination Liability Coverage Part and the Fiduciary Liability Coverage Part, if purchased as set forth in the Coverage Schedule in Item 6 of the Declarations.

T.   **Loss** means:

1.   with respect to any **Liability Coverage Part**, the amounts defined as **Loss** in such Coverage Part; and

2.   with respect to any **Non-Liability Coverage Part**, the amounts covered under such Coverage Part.

U.   **Managers** means any natural person who was, now is or shall become (i) a manager, member of the Board of Managers or equivalent executive of a **Company** that is a limited liability company, and (ii) a general partner, managing partner or equivalent executive of a partnership or joint venture that is expressly included as a **Company** by endorsement to this policy.

V.   **Non-Liability Coverage Part** means the Crime Coverage Part if purchased as set forth in the Coverage Schedule in Item 6 of the Declarations.

W.   **Plans** means the plans and programs defined as **Plans** in the Fiduciary Liability Coverage Part, if purchased.

X.   **Policy Period** means the period set forth in Item 3 of the Declarations, subject to prior termination in accordance with Section XV of these General Terms and Conditions.

Y.   **Policyholder** means the organization designated in Item 1 of the Declarations.

Z.   **Pollutants** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by, or identified on a list of hazardous substances issued by, the United States Environmental Protection Agency or a state, county, municipality or locality counterpart thereof. **Pollutants** shall also mean any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, silica, noise, fungus (including mold, mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but not any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field. Such matters shall include, without limitation, solids, liquids, gaseous, thermal, biological, nuclear or radiological irritants, contaminants or smoke, soot, fumes, acids, alkalis, chemicals or waste materials.

AA.   **Run-Off Coverage Period** means the period of the extended coverage under the **Liability Coverage Parts**, as described in Subsection VI.B of these General Terms and Conditions.

BB.   **Subsidiary** means:

1.   any organization, other than a joint venture or partnership, in which more than fifty percent (50%) of the outstanding voting securities or voting rights representing the present right to vote for election of directors, trustees, **Managers** or equivalent executives is owned or controlled, directly or indirectly, in any combination, by one or more **Companies**;

2.   any organization, other than a joint venture or partnership, in which one or more **Companies**, in any combination, directly or indirectly have the right, pursuant to a written contract with or the bylaws, charter, operating agreement or similar document of such organization, to elect or appoint a majority of the directors, **Managers** or equivalent executives of such organization; and

3.   any foundation, charitable trust or political action committee controlled or exclusively sponsored by one or more **Companies**.

CC. **Third Party Discrimination Claim** means a **Claim**, other than an **Employment Practices Claim**, which is brought and maintained by or on behalf of any natural person (including customers, vendors, service providers and other business invitees) other than an **Insured Person** for an actual or alleged violation of any law or public policy concerning discrimination or harassment.

DD. **Wrongful Acts** means, with respect to any **Liability Coverage Part**, the acts, errors, omissions and other matters defined as **Wrongful Acts** in such Coverage Part.

III.    LIMITS OF LIABILITY, RETENTION AND SINGLE CLAIMS

A.    LIMITS OF LIABILITY FOR LIABILITY COVERAGE PARTS

1.    Combined Aggregate Limit of Liability

The amount set forth in Item 2 of the Declarations shall be the Underwriter's maximum aggregate liability for all **Loss** covered under all Coverage Parts, combined, other than the Crime Coverage Part.

2.    Liability Coverage Part Limit of Liability

The respective Limit of Liability for each **Liability Coverage Part**, as set forth in the Coverage Schedule in Item 6 of the Declarations, shall be the Underwriter's maximum aggregate liability for all **Loss** on account of all **Claims** under such **Liability Coverage Part**.  The Limit of Liability for each **Liability Coverage Part** shall be part of and not in addition to the Combined Aggregate Limit of Liability as set forth in Item 2 of the Declarations.

3.    Shared Liability Coverage Part Limit of Liability

If a Limit of Liability for a **Liability Coverage Part** is designated in the Coverage Schedule in Item 6 of the Declarations as a shared Limit of Liability, then the Underwriter's maximum aggregate liability for all **Loss** covered under all such shared **Liability Coverage Parts** combined shall be the largest of such shared Limits of Liability.  Such shared Limit of Liability shall be part of and not in addition to the Combined Aggregate Limit of Liability as set forth in Item 2 of the Declarations.  This paragraph further limits the Underwriter's maximum liability under each such **Liability Coverage Part** and does not increase the respective separate Limit of Liability for each **Liability Coverage Part**.

4.    Sublimit of Liability

Any Sublimit of Liability set forth in the Coverage Schedule in Item 6 of the Declarations shall be part of and not in addition to the Combined Aggregate Limit of Liability set forth in Item 2 of the Declarations and the applicable Coverage Part Limit of Liability.

5.    Defense Costs Within Limit of Liability

**Defense Costs** are part of and not in addition to the Limits of Liability applicable to the **Liability Coverage Parts**, and the payment by the Underwriter of **Defense Costs** reduces such Limits of Liability. If the applicable Limit of Liability is exhausted by payment of **Loss**, the Underwriter's obligations, including without limitation its duty to defend, shall be completely fulfilled and extinguished.  Subject to Section XIV of these General Terms and Conditions, the Underwriter is entitled to pay **Loss** as it becomes due and payable by the **Insureds**, without consideration of other future payment obligations.

6.    Additional Limit of Liability for Defense Costs

If the Limit of Liability applicable to **Loss** covered under a **Liability Coverage Part** is exhausted by payments by the Underwriter, then the Underwriter's liability for any **Defense Costs** which are covered under such **Liability Coverage Part** and which are incurred thereafter on account of a **Claim** separate from the **Claim(s)** which exhausted such Limit of Liability shall be subject to an additional Limit of Liability in an amount set forth in Item 7 of the Declarations.

7.    Extended Reporting Period or Run-Off Coverage Period Limit of Liability

The Limit of Liability for any **Extended Reporting Period** or **Run-Off Coverage Period** under the **Liability Coverage Parts** shall be part of and not in addition to the applicable Limits of Liability for the **Liability Coverage Parts** as set forth in Items 2 and 6 of the Declarations.  If more than one individual **Extended Reporting Period** or **Run-Off Coverage Period** is elected pursuant to Subsection IV.C of these General Terms and Conditions, the Underwriter's maximum aggregate liability under all such

individual **Extended Reporting Periods** or **Run-Off Coverage Periods**, combined, shall not exceed the Underwriter's maximum aggregate liability for any one individual **Extended Reporting Period** or **Run-Off Coverage Period**; provided, however, that if the Underwriter reasonably concludes when an **Insured Person** elects such an individual **Extended Reporting Period** or **Run-Off Coverage Period** that applicable law may prohibit the enforceability of this sentence, the Underwriter shall have the right to condition such election by the **Insured Person** upon the **Insured Person's** acceptance of an endorsement to this policy which creates a separate, but lower, limit of liability applicable only to such **Insured Person's** coverage under such **Extended Reporting Period** or **Run-Off Coverage Period.**

B.   RETENTION FOR LIABILITY COVERAGE PARTS

The Underwriter's liability under the **Liability Coverage Parts** with respect to **Loss** on account of each **Claim** shall apply only to that part of **Loss** which is excess of the applicable Retention set forth in the Coverage Schedule in Item 6 of the Declarations, and such Retention shall be borne by the **Insureds** uninsured and at their own risk.  No Retention shall apply to **Loss** incurred by an **Insured Person** for which the **Company** is not permitted by common or statutory law to indemnify, or is not financially able to indemnify by reason of **Financial Impairment**.

C.   LIMITS OF LIABILITY AND DEDUCTIBLE FOR NON-LIABILITY COVERAGE PART

The Underwriter's maximum liability and the applicable Deductible under the **Non-Liability Coverage Parts** shall be the respective Limits of Liability and Deductible amounts as set forth in either the Coverage Schedule in Item 6 of the Declarations or the respective Coverage Part Declarations, if any.  Such Limits of Liability and Deductible amounts will be applied as described in the respective **Non-Liability Coverage Part**.

D.   SINGLE CLAIMS

All **Claims** under the **Liability Coverage Parts** which arise out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of **Insureds** shall be deemed one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made against any **Insured**, regardless of whether such date is before or during the **Policy Period**.

E.   SINGLE CLAIM COVERED BY MULTIPLE LIABILITY COVERAGE PARTS

If a single **Claim** (as described in Subsection III.D above) is covered in whole or in part under more than one **Liability Coverage Part**:

1.   the applicable Retention under each such **Liability Coverage Part** shall be applied with respect to coverage for such **Claim** under such **Liability Coverage Part**, provided the sum of all applicable Retentions under all such **Liability Coverage Parts** shall not exceed the largest of such applicable Retentions; and

2.   the remaining applicable Limits of Liability under each such **Liability Coverage Part** shall apply with respect to coverage for such **Claim** under such **Liability Coverage Part**, provided the Underwriter's maximum aggregate liability for all **Loss** covered under all such **Liability Coverage Parts**, combined, on account of such **Claim** shall not exceed the largest of such remaining applicable Limits of Liability.  This paragraph 2 does not increase the Underwriter's maximum liability with respect to such **Claim**, which is also subject to the Combined Aggregate Limit of Liability as set forth in Item 2 of the Declarations and any Shared Limit of Liability described in Subsection III.A.3 above.

IV.   LIABILITY COVERAGE PART EXTENSIONS

A.   ESTATES, LEGAL REPRESENTATIVES, SPOUSES AND DOMESTIC PARTNERS

The estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** of **Insured Persons** shall be considered an **Insured Person** under the **Liability Coverage Parts** but only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where such **Claim** seeks damages from marital community property, jointly held property or property transferred from the **Insured Person** to the spouse or **Domestic Partner**.  No coverage is provided for any wrongful act or omission of an estate, heir, legal representative, assign, spouse or **Domestic Partner**.  All provisions in these General Terms and Conditions and the respective **Liability Coverage Part** applicable to **Loss** incurred by the **Insured Person** shall also apply to loss incurred by such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners.**

B.   EXTENDED REPORTING PERIOD

If the Underwriter or **Policyholder** terminates or refuses to renew this policy other than for nonpayment of premium, the **Insureds** shall have the right, upon payment of the additional premium set forth in Item 4.A.1 of the Declarations, to an extension of the coverage granted by the **Liability Coverage Parts** for the **Extended Reporting Period** set forth in Item 4.A.2 of the Declarations following the effective date of termination or nonrenewal, but only with respect to any **Wrongful Act** taking place prior to the effective date of such termination or nonrenewal.  This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due, is given by the **Insureds** to the Underwriter within thirty (30) days following the effective date of termination or nonrenewal.

The offer of renewal terms and conditions or premiums different from those in effect prior to renewal shall not constitute refusal to renew.

The entire additional premium for the **Extended Reporting Period** shall be deemed fully earned at the inception of the **Extended Reporting Period**.

The **Insureds** shall not be entitled to elect the **Extended Reporting Period** if a **Run-Off Coverage Period** is purchased.

C.   INDIVIDUAL INSURED PERSON EXTENDED COVERAGE

If with respect to the Management and Company Liability Coverage Part or the Fiduciary Liability Coverage Part the **Insureds** are entitled to but do not exercise the **Extended Reporting Period** or the **Run-Off Coverage Period**, any **Insured Person** shall have the right to elect an **Extended Reporting Period** or **Run-Off Coverage Period** under such Coverage Part for only such **Insured Person**, subject to the provisions of this policy.  The extension of coverage pursuant to any such individual **Extended Reporting Period** or **Run-Off Coverage Period** shall apply only with respect to coverage under such Coverage Part for **Loss** which is incurred by the **Insured Person** who elected such extension of coverage and which is not indemnified by the **Company**, and shall not apply to any other coverage afforded under this policy.

This right of extension shall lapse unless written notice of such election is given by the **Insured Person** to the Underwriter within thirty (30) days after the **Policyholder's** right to exercise the **Extended Reporting Period** has expired, or with respect to the **Run-Off Coverage Period**, within thirty (30) days after the end of the **Policy Period**.  If one or more **Insured Persons** give such written notice within such thirty (30) day period, then promptly after expiration of such thirty (30) day period the Underwriter shall notify all the **Insured Persons** who elected such individual **Extended Reporting Period** or **Run-Off Coverage Period** of the additional premium payable by each such **Insured Person** for such extension.  This extension of coverage for any such **Insured Person** is conditioned upon such **Insured Person** paying such additional premium within fifteen (15) days after being notified of the amount of the additional premium.

V.   ALLOCATION

If in any **Claim** under the **Liability Coverage Parts** the **Insureds** incur both **Loss** covered by this policy and loss not covered by this policy either because the **Claim** against the **Insureds** includes both covered and uncovered matters or because the **Claim** is made against both **Insureds** who are afforded coverage for such **Claim** and others, including **Insureds**, who are not afforded coverage for such **Claim**, the **Insureds** and the Underwriter shall use their best efforts to allocate such amount between covered **Loss** and uncovered loss based upon the relative legal and financial exposures of the parties to covered and uncovered matters; provided however that one hundred percent (100%) of any such **Defense Costs** shall be allocated to covered **Loss** if and to the extent such **Defense Costs** are incurred by covered **Insureds** and are in part covered and in part not covered by this policy solely because the **Claim** against the **Insureds** includes both covered and uncovered matters.

Nothing in this Section V. shall limit, waive or remove the rights of any **Insured** or the Underwriter to assert claims for indemnity or contribution against third parties pursuant to any statutory or common law or any provision of this policy.

In any arbitration, suit or other proceeding among the Underwriter and the **Insureds** or the **Company**, no presumption shall exist concerning what is a fair and proper allocation between covered **Loss** and uncovered loss.

VI.   CHANGES IN EXPOSURE

   A.   NEW ORGANIZATIONS

   1.   If before or during the **Policy Period** the **Company** acquires or creates a new **Subsidiary** or acquires an entity by merger or consolidation, coverage under any **Liability Coverage Part** automatically shall apply to the new organization and its **Insureds**, provided such coverage shall apply only with respect to **Claims** for **Wrongful Acts** taking place after such acquisition or creation.

   2.   However, if (i) such newly acquired organization is a financial institution, healthcare entity or is publicly owned, (ii) the total assets of such newly acquired organization exceeds thirty percent (30%) of the total assets of the **Policyholder** as reflected in their respective most recent audited consolidated financial statements, (iii) solely with respect to the Employment Practices and Third Party Discrimination Liability Coverage Part and the Crime Coverage Part, if purchased, the total number of **Employees** of all **Companies** increases by more than thirty percent (30%) as an immediate result of such acquisition, merger or consolidation, or (iv) solely with respect to the Fiduciary Liability Coverage Part, if purchased, the total assets of all **Plans** of such newly acquired organization exceeds thirty percent (30%) of the total assets of all other **Plans** of all **Companies** as reflected in their respective most recent financial statements, then coverage under this policy or such Coverage Part as provided in subsection 1 above shall apply only if the Underwriter agrees to afford such coverage pursuant to subsection 3 below.

   3.   The Underwriter may agree to extend the coverage described in subsection 1 above to the new organization described in subsection 2 above and its **Insureds** if, within ninety (90) days after the acquisition, the **Policyholder** provides any additional information, pays any additional premium and agrees to any additional terms and conditions reasonably required by the Underwriter for such extension of coverage.  In such event, the Underwriter shall issue an endorsement to this policy confirming such coverage extension.

   B.   ACQUISITION OF POLICYHOLDER

   If during the **Policy Period** the **Policyholder** merges into or consolidates with another organization such that the **Policyholder** is not the surviving entity, or another organization or person or group of organizations and/or persons acting in concert acquires securities or voting rights which result in ownership or voting control by the other organization(s) or person(s) of more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of directors, trustees or equivalent executives of the **Policyholder**, then coverage under any **Liability Coverage Part** shall continue until the termination of this policy or, if the **Run-Off Coverage Period** is purchased with respect to the **Liability Coverage Part**, the expiration of the **Run-Off Coverage Period**, provided such coverage shall apply only with respect to **Claims** for **Wrongful Acts** taking place prior to such merger, consolidation or acquisition.

   The right to exercise the **Run-Off Coverage Period** with respect to the **Liability Coverage Parts** shall lapse unless the **Policyholder** gives written notice of such exercise to the Underwriter prior to expiration of the **Policy Period**, including the requested length of the **Run-Off Coverage Period** which shall not exceed six (6) years after such merger, consolidation or acquisition.  If the **Policyholder** requests a **Run-Off Coverage Period** as described in Item 4.B.2 of the Declarations, then the additional premium for such **Run-Off Coverage Period** shall be as described in Item 4.B.1 of the Declarations.  If the **Policyholder** requests another **Run-Off Coverage Period**, the Underwriter shall then notify the **Policyholder** of the additional premium for the requested **Run-Off Coverage Period**.  The **Policyholder** shall promptly pay such additional premium as a condition precedent to commencement of the **Run-Off Coverage Period**.

   The entire additional premium for the **Run-Off Coverage Period** shall be deemed fully earned at the inception of the **Run-Off Coverage Period**.

   The **Policyholder** shall not be entitled to elect the **Run-Off Coverage Period** if the **Extended Reporting Period** is elected pursuant to Subsection IV.B.

   C.   CESSATION OF SUBSIDIARIES

   If before or during the **Policy Period** an organization ceases to be a **Subsidiary**, coverage with respect to such **Subsidiary** and its **Insureds** shall continue until termination of this policy, provided such coverage shall apply (i) with respect to any **Liability Coverage Parts**, only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Subsidiary**, and (ii) with respect to any **Non-Liability Coverage Part**, only with respect to **Coverage Events** taking place prior to the date such organization ceased to be a **Subsidiary**.

D.   CESSATION OF PLANS

If before or during the **Policy Period** a **Plan** is terminated, coverage for such **Plan** and its **Insureds** under the Fiduciary Liability Coverage Part, if purchased, shall continue until termination of such Coverage Part with respect to **Wrongful Acts** taking place before or after such termination.

VII.   DEFENSE AND SETTLEMENT

A.   LIABILITY COVERAGE PART DEFENSE AND SETTLEMENT

1.   The Underwriter shall have the right and duty to defend any **Claim** which is against the **Insureds** and which is covered by the **Liability Coverage Parts**.  Coverage shall apply even if any of the allegations are groundless, false or fraudulent.  The Underwriter's duty to defend any **Claim** shall cease upon exhaustion of the applicable Limit of Liability.

2.   Without limiting the Underwriter's right to defend any **Claim**:

a.   The **Insureds** agree not to offer to settle or to settle any **Claim**, incur any **Defense Costs** or otherwise assume any contractual obligation, admit any liability or stipulate to any judgment with respect to any **Claim** without the Underwriter's written consent, which shall not be unreasonably withheld.  The Underwriter shall not be liable for or as a result of any offer to settle, settlement, **Defense Costs**, assumed obligation, admission or stipulated judgment to which it has not given its prior consent.

b.   The Underwriter shall have the right and shall be given the opportunity to make any investigation it deems necessary and to effectively associate with the **Insureds** in the investigation, defense and settlement, including but not limited to the negotiation of a settlement, of any **Claim** that is or reasonably could be covered in whole or in part by the **Liability Coverage Parts**.

3.   The Underwriter may, with the consent of the **Insured**, make any settlement of any **Claim** covered under a **Liability Coverage Part** which the Underwriter deems expedient.  Solely with respect to the Employment Practices and Third Party Discrimination Liability Coverage Part, if purchased, if the **Insured** against whom the **Claim** is made withholds consent to any settlement acceptable to the claimant and recommended by the Underwriter (a "Proposed Settlement"), the Underwriter's liability for all **Loss**, including **Defense Costs**, incurred by such **Insured** on account of such **Claim** shall not exceed:

a.   the amount of the Proposed Settlement plus **Defense Costs** incurred up to the date of the **Insured's** refusal to consent to Proposed Settlement of such **Claim**; and

b.   eighty percent (80%) of any **Loss**, including **Defense Costs**, in excess of the amount referenced in paragraph a above, incurred in connection with such **Claim**; subject in all events to the applicable Retention and Limit of Liability.  The remaining twenty percent (20%) of any **Loss**, including **Defense Costs**, in excess of the amount referenced in paragraph a above will be borne by the **Insured** uninsured and at its own risk, notwithstanding anything to the contrary contained in Section V, Allocation.

B.   COOPERATION

With respect to all Coverage Parts, the **Insureds** agree to provide the Underwriter with all information, assistance and cooperation which the Underwriter reasonably requests and agree that in the event of a **Claim** or **Coverage Event**, the **Insureds** will do nothing that shall prejudice the Underwriter's position or its potential or actual rights of recovery.

VIII.   REPORTING AND NOTICE

A.   Solely with respect to any **Liability Coverage Part**:

1.   As a condition precedent to their rights under any **Liability Coverage Part**, the **Insureds** shall give to the Underwriter written notice of any **Claim** made against the **Insureds** as soon as practicable after an **Executive Officer** or an employee of the **Company's** office of general counsel, risk management or functionally equivalent departments, if any, first learns of such **Claim**, but in no event later than (i) ninety (90) days after expiration of the **Policy Period**, or (ii) the expiration of the **Extended Reporting Period** or **Run-Off Coverage Period**, if exercised.

2.   If during the **Policy Period** or the **Extended Reporting Period** or **Run-Off Coverage Period**, if exercised, the **Insureds** become aware of circumstances that could give rise to a **Claim** against the

*Clerk of the District Court, Johnson County Kansas*
*10/07/21  04:38pm NG*

**Insureds** and give written notice of such circumstances to the Underwriter during the **Policy Period** or the **Extended Reporting Period** or **Run-Off Coverage Period**, if exercised, then any **Claims** subsequently arising from such circumstances shall be considered to have been made during the **Policy Period**. No coverage is afforded under any **Liability Coverage Part** for fees, expenses or other loss incurred in connection with such potential **Claim** prior to the time such notice results in a **Claim**.

3. As a condition precedent to exercising their rights under any **Liability Coverage Part**, the **Insureds** shall (i) include within any notice of **Claim** or circumstance a description of the **Claim** or circumstances, the nature of the alleged **Wrongful Act**, the nature of the alleged or potential damage, the names of actual or potential claimants, and the manner in which the **Insureds** first became aware of the **Claim** or circumstances; and (ii) give to the Underwriter such information and cooperation as it may reasonably require.

B. Solely with respect to any **Non-Liability Coverage Part**, as a condition precedent to their rights under such Coverage Part, the **Insureds** shall give to the Underwriter written notice of any **Coverage Event** pursuant to the applicable notice provision in such **Non-Liability Coverage Part**.

C. Except as otherwise provided in this policy, all notices under any provision of this policy shall be in writing and given by prepaid express courier, certified mail, email or fax properly addressed to the appropriate party. Notice to the **Insureds** may be given to the **Policyholder** at the address as shown in Item 1 of the Declarations. Notice to the Underwriter shall be given to the respective address shown in Item 5 of the Declarations. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or in the case of courier, email or fax, one day following the date such notice is sent, whichever is earlier, subject to proof of transmittal.

IX. REPRESENTATIONS, SEVERABILITY AND NON-RESCINDABLE COVERAGES

A. REPRESENTATIONS

The **Insureds** represent and acknowledge that the statements and information contained in the **Application** are true and complete, are the basis of this policy and are to be considered as incorporated into and constituting a part of this policy. This policy is issued in reliance upon the truth and completeness of such representations.

B. SEVERABILITY

The **Application** shall be construed as a separate application for coverage by each of the **Insured Persons**. In the event the **Application** contains any misrepresentation or omission (i) made with the intent to deceive, or (ii) which materially affects either the acceptance of the risk or the hazard assumed by the Underwriter under a **Liability Coverage Part**, then such **Liability Coverage Part** shall be void *ab initio* as to:

1. any **Company** to the extent such **Company** indemnifies an **Insured Person** who knew the facts that were not truthfully disclosed in the **Application**; and

2. any **Company** and its **Subsidiaries** and **Plans** if an **Executive Officer** of such **Company** knew the facts that were not truthfully disclosed in the **Application**;

whether or not such **Executive Officer** or **Insured Person** knew the **Application** contained such misrepresentation or omission. No knowledge of one **Insured Person** shall be imputed to any other **Insured Persons** for purposes of this Section IX.

C. NON-RESCINDABLE COVERAGES

The Underwriter shall not have the right to rescind or void, in whole or in part, the coverage provided under any **Liability Coverage Part** for any **Loss** incurred by the **Insured Persons** which is not indemnified by the **Company**.

X. TERRITORY AND VALUATION

Coverage under any **Liability Coverage Part** shall extend to **Wrongful Acts** taking place, **Loss** incurred, or **Claims** made anywhere in the world, to the extent legally permitted.

All premiums, limits, retentions, **Loss** and other amounts under this policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this policy is stated in a currency other than United States dollars, payment under this policy shall be

made in United States dollars at the rate of exchange on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

XI.  OTHER INSURANCE

Solely with respect to any **Liability Coverage Part**, if any **Loss** is insured under any other valid and collectible policy(ies) issued to any **Insured**, then this policy shall act as an excess insurance policy and will cover such **Loss**, subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such **Loss** is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided in this policy.

XII.  SUBROGATION

Solely with respect to any **Liability Coverage Part**, in the event of any payment under this policy, the Underwriter shall be subrogated to the extent of such payment to all the **Insureds'** rights of recovery, including without limitation any right of recovery from the **Company** for **Loss** incurred by **Insured Persons** which is indemnifiable by the **Company**.  The **Insureds** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable the Underwriter effectively to bring suit in the name of the **Insureds**.  In any subrogation claim against the **Company** to enforce the **Insured Persons'** right of indemnification, the shareholder and board of director resolutions of the **Company** shall be deemed to provide indemnification to the fullest extent permitted by law, and the Underwriter's recovery from the **Company** for such **Loss** shall not exceed the Retention applicable to the **Company** for such **Loss**.  The Underwriter shall not exercise its right of subrogation against an **Insured Person** with respect to payments under any **Liability Coverage Part** unless and to the extent one of the following respective exclusions in such **Liability Coverage Part** applies to such **Insured Person**:

| Liability Coverage Part | Exclusions |
|---|---|
| Management and Company Liability | Sections IV.I and J |
| Employment Practices and Third Party  Discrimination Liability | Sections IV.G and H |
| Fiduciary Liability | Section III.E |

XIII.  ALTERATION, ASSIGNMENT AND HEADINGS

No change in, modification of, or assignment of interest under this policy shall be effective except when made by a written endorsement to this policy which is signed by an authorized representative of the Underwriter.

The titles and headings to the various sections, subsections and endorsements of this policy, as well as the schedule of endorsements attached to this policy, are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions or existence of such sections, subsections or endorsements.

XIV.  PAYMENT PRIORITY

If the **Loss** due and owing by the Underwriter under a **Liability Coverage Part** exceeds the then-remaining Limit of Liability applicable to such **Loss**, the Underwriter shall pay such **Loss**, subject to the applicable Limits of Liability, in the following priority:

A.  First, the Underwriter shall pay such **Loss** which is incurred by **Insured Persons** and which is not indemnified by the **Company**;

B.  Second, the Underwriter shall pay all other **Loss** covered under the **Liability Coverage Part**.

Subject to the foregoing paragraph, the Underwriter shall, upon receipt of a written request from the **Policyholder**, delay any payment of **Loss** due and owing to the **Company** until such time as the **Policyholder** designates, provided the Underwriter's liability with respect to any such delayed **Loss** payment shall not be increased, and shall not include any interest, on account of such delay.

XV.  POLICY TERMINATION AND NONRENEWAL

This policy shall terminate at the earliest of the effective date of nonrenewal of the **Policy Period** shown in Item 3 of the Declarations or the effective date of cancellation, as described below.

A.  CANCELLATION

    1.  The **Policyholder** may cancel this policy by surrender of this policy to the Underwriter or by giving prior written notice to the Underwriter stating when such cancellation shall take effect.

    2.  The Underwriter may cancel this policy only for nonpayment of premium.  In such event, the Underwriter shall mail written notice of cancellation for nonpayment of premium to the **Policyholder**.  Such notice shall state the effective date of cancellation, which shall not be less than fifteen (15) days after mailing such notice.

    3.  In the event of cancellation, the Underwriter shall refund the unearned premium computed pro rata.

B.  NONRENEWAL

If the Underwriter elects not to renew this policy, the Underwriter shall mail to the **Policyholder** written notice thereof at least sixty (60) days prior to the expiration of the **Policy Period**.  The Underwriter's offer of renewal terms and conditions or premiums different from those in effect prior to renewal shall not constitute an election by the Underwriter not to renew this policy.

C.  NOTICE

The Underwriter shall send all notices required under this Section XV by certified mail to the **Policyholder** at the address in Item 1 of the Declarations, and by mail or electronic mail to the **Policyholder's** authorized agent, if any.  Proof of mailing will be sufficient proof of notice.

XVI.  AUTHORIZATION CLAUSE

By acceptance of this policy, the **Policyholder** agrees to act on behalf of the **Insureds** with respect to giving and receiving notices of **Claim** or termination, paying premiums and receiving any return premiums that may become due under this policy, agreeing to endorsements, and giving or receiving notices provided for in this policy (except notices to apply for the **Extended Reporting Period** or **Run-Off Coverage Period**), and the **Insureds** agree that the **Policyholder** shall act on their behalf.

XVII.  BANKRUPTCY

Bankruptcy or insolvency of any **Insured** or of the estate of any **Insured** shall not relieve the Underwriter of its obligations nor deprive the Underwriter of its rights or defenses under this policy.

In the event a liquidation or reorganization proceeding is commenced by or against a **Company** pursuant to the United States Bankruptcy Code, as amended, or any similar foreign, state or local law, the **Company** and the **Insureds** hereby (i) waive and release any automatic stay or injunction which may apply in such proceeding to this policy or its proceeds under such bankruptcy law, and (ii) agree not to oppose or object to any efforts by the Underwriter, the **Company** or any **Insured** to obtain relief from any such stay or injunction.

XVIII. ALTERNATIVE DISPUTE RESOLUTION

The **Insureds** and the Underwriter shall submit any dispute or controversy arising out of or relating to this policy to non-binding mediation.  Unless otherwise agreed by the parties, such non-binding mediation shall be administered by the American Arbitration Association in accordance with its then-prevailing Commercial Mediation Rules.

If the dispute is not resolved in the mediation, then either party to the mediation may thereafter commence a judicial proceeding against the other party with respect to such dispute, provided that neither party may commence such a judicial proceeding prior to ninety (90) days following termination of the mediation.

The parties to the mediation shall share equally the fees and expenses of the mediator as well as other common expenses of the mediation process.

# Private Company Select Insurance Policy Employment Practices and Third Party Discrimination Liability Coverage Part



## TABLE OF CONTENTS

Page

I.   INSURING CLAUSES ........................................................................................................................2

    A.   EMPLOYMENT PRACTICES LIABILITY COVERAGE ...............................................................2

    B.   THIRD PARTY DISCRIMINATION LIABILITY COVERAGE.........................................................2

II.  ENVIRONMENTAL MISMANAGEMENT COVERAGE EXTENSION...........................................2

III. DEFINITIONS ...................................................................................................................................2

IV.  EXCLUSIONS ..................................................................................................................................3

# Employment Practices and Third Party Discrimination Liability Coverage Part



## I. INSURING CLAUSES

### A. EMPLOYMENT PRACTICES LIABILITY COVERAGE

The Underwriter shall pay on behalf of the **Insureds** all **Loss** for which the **Insureds** become legally obligated to pay on account of any **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or during the **Extended Reporting Period** or **Run-Off Coverage Period**, if exercised, for a **Wrongful Act** taking place before or during the **Policy Period**.

### B. THIRD PARTY DISCRIMINATION LIABILITY COVERAGE

The Underwriter shall pay on behalf of the **Insureds** all **Loss** for which the **Insureds** become legally obligated to pay on account of any **Third Party Discrimination Claim** first made against the **Insureds** during the **Policy Period** or during the **Extended Reporting Period** or **Run-Off Coverage Period**, if exercised, for a **Wrongful Act** taking place before or during the **Policy Period**.

## II. ENVIRONMENTAL MISMANAGEMENT COVERAGE EXTENSION

Subject to this policy's other terms and conditions, coverage under Insuring Clause A for **Claims** against **Insured Persons** includes coverage for any **Environmental Mismanagement Claim**.

## III. DEFINITIONS

When used in this Coverage Part, the following terms, whether in the singular or plural, are defined as follows:

A. **Claim**, for purposes of the definitions of **Employment Practices Claim** and **Third Party Discrimination Claim** in the General Terms and Conditions, means:

1. a written demand against any **Insured** for monetary damages or non-monetary or injunctive relief commenced by the **Insured's** receipt of such demand, including a written demand that the **Insured** toll or waive a statute of limitations;

2. a civil proceeding against any **Insured** commenced by the service of a complaint or similar pleading;

3. an administrative or regulatory proceeding against any **Insured**, including a proceeding before the Equal Employment Opportunity Commission or a similar state or local governmental body, commenced by the filing of a notice of charges or similar document;

4. a civil, administrative or regulatory investigation of any **Insured** commenced by the service upon or other receipt by the **Insured Person** of a target letter or other written notice from the investigating authority identifying by name the **Insured Person** as an individual against whom a proceeding may be commenced;

5. an official request for the **Extradition** of any **Insured Person** or the execution of a warrant for the arrest of any **Insured Person** where such execution is an element of **Extradition**; or

6. an arbitration or mediation proceeding against any **Insured**;

for a **Wrongful Act**, including any appeal therefrom; provided **Claim** does not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

B. **Environmental Mismanagement Claim** means any **Employment Practices Claim** based upon, arising out of or attributable to an **Environmental Event** if and to the extent such **Claim**: (i) is against an **Insured Person** for retaliatory treatment, or (ii) results in **Loss** incurred by **Insured Persons** for which the **Company** does not indemnify the **Insured Persons** either because the **Company** is neither permitted nor required to grant such indemnification or because of **Financial Impairment**.

C. **Independent Contractor** means any natural person who is not an **Employee** and who is working for a **Company** in the capacity of an independent contractor pursuant to an express contract or agreement with the **Company** which governs the nature of such person's engagement.

D. **Insured Persons** means:

1. any one or more natural persons who were, now are or shall become a duly elected or appointed director, trustee, governor, **Manager**, officer, **Employee** (including employed lawyers solely in their capacity as an **Employee**), advisory director, or member of a duly constituted committee or board of the **Company**, or their functional equivalent;

2. any **Independent Contractor**, but only if the **Company** agrees in writing within thirty (30) days after the **Claim** is made to provide indemnification to such **Independent Contractor** for any **Loss** arising out of such **Claim**; provided any coverage under this Coverage Part for any such **Independent Contractor** shall be specifically excess of any indemnification or insurance otherwise available to such **Independent Contractor** from any other source.

E. **Insureds** means the **Insured Persons** and the **Company**.

F. **Loss** means the total amount the **Insureds** become legally obligated to pay on account of **Claims** made against them for **Wrongful Acts** for which coverage applies, including, but not limited to, damages (including back pay, front pay and punitive, exemplary or multiple damages), judgments, any award of pre-judgment and post-judgment interest with respect to covered damages, settlements, **Defense Costs**, prevailing plaintiff attorney's fees awarded pursuant to Section 1988 of the Civil Rights Act, and liquidated damages awarded under the Age Discrimination in Employment Act, the Equal Pay Act or the Family Medical Leave Act.

The insurability of such punitive, exemplary, liquidated and multiple damages or attorney's fees shall be determined under the internal laws of any applicable jurisdiction most favorable to the **Insureds**, including without limitation the jurisdiction in which the **Company** the **Insured Persons**, the Underwriter, this policy or such **Claim** is located.

**Loss** does not include any of the following:

1. any amount not indemnified by the **Company** for which the **Insureds** are absolved from payment by reason of any covenant, agreement or court order;

2. taxes, fines or penalties imposed by law; or

3. matters uninsurable under the law pursuant to which this policy is construed.

provided sub. 1 through 3 above do not apply to **Defense Costs**.

G. **Wrongful Act** means:

1. any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any of the **Insured Persons**, individually or otherwise, in their capacity as such, or by the **Company**; or

2. any matter claimed against the **Insured Persons** solely by reason of their serving in such capacity.

IV. EXCLUSIONS

The Underwriter shall not be liable under this Coverage Part for **Loss** on account of, and shall not be obligated to defend, any **Claim** made against any **Insured**:

A. based upon, arising out of, or attributable to any fact, circumstance or situation which has been the subject of any written notice given prior to inception of this policy under any prior employment practices liability or comparable insurance policy or coverage part;

B. based upon, arising out of, or attributable to any written demand, suit or proceeding pending, or order, decree or judgment entered against the **Insureds** on or prior to the respective Pending or Prior Date set forth in the Coverage Schedule in Item 6 of the Declarations, or the same or substantially the same **Wrongful Act**, **Interrelated Wrongful Acts**, fact, circumstance or situation underlying or alleged therein;

C.  for an actual or alleged violation of the responsibilities, obligations or duties imposed by:

1.  any law governing workers' compensation, unemployment insurance, social security, disability benefits or similar law,

2.  **ERISA** (except Section 510 thereof),

3.  the Fair Labor Standards Act (except the Equal Pay Act) and any other law concerning wage and hour practices, including, but not limited to any **Claim** for off-the-clock work, failure to provide rest or meal periods, failure to reimburse expenses, improper classification of employees as exempt or non-exempt, failure to timely pay wages, conversions, unjust enrichment, or unfair business practices,

4.  the National Labor Relations Act,

5.  the Worker Adjustment and Retraining Notification Act,

6.  the Consolidated Omnibus Budget Reconciliation Act of 1985,

7.  the Occupational Safety and Health Act,

8.  the Racketeer Influenced and Corrupt Organizations Act,

9.  the Federal False Claims Act, or

10. rules or regulations promulgated under any of such statutes or laws, amendments thereto or similar provisions of any federal, state, local or foreign statutory law or common law;

but this exclusion shall not apply to any **Claim** for any actual or alleged retaliatory treatment of the claimant by the **Insured** on account of the claimant's exercise of rights pursuant to any such law, rule or regulation or for any other actual or alleged violation of any whistleblower statute or law;

D.  for bodily injury, sickness, disease or death of any person or damage to or destruction of any tangible property including loss of use thereof; provided this exclusion shall not apply to any **Claim** for emotional distress, mental anguish or humiliation;

E.  based upon, arising out of, or attributable to an **Environmental Event**, provided this exclusion shall not apply to any **Environmental Mismanagement Claim**;

F.  based upon, arising out of, or attributable to any actual or alleged breach of any contract or agreement, provided such contract or agreement  specifies the terms of the **Company's** engagement of an **Independent Contractor**;

G.  based upon, arising out of, or attributable to any deliberately fraudulent or deliberately criminal act or omission committed by such **Insured**, if a final and non-appealable adjudication adverse to such **Insured** in any proceeding not brought by the Underwriter establishes such a deliberately fraudulent act or omission; provided this exclusion shall not apply to **Defense Costs**;

H.  based upon, arising out of, or attributable to such **Insured** gaining any profit, remuneration or financial advantage to which such **Insured** was not legally entitled, if a final and non-appealable adjudication adverse to such **Insured** in any proceeding not brought by the Underwriter establishes such **Insured** in fact gained any such profit, remuneration or advantage; provided this exclusion shall not apply to **Defense Costs**;

I.  based upon, arising out of, or attributable to the employment reinstatement or continued employment of the claimant by the **Company** or, if the **Company** has the option pursuant to an adjudication or settlement to reinstate the claimant as an **Employee** but fails to do so, any **Loss** constituting front pay, future damages or other future economic relief or the equivalent thereof with respect to such claimant; or

J.  if such **Loss** constitutes:

1.  the cost of any non-monetary relief, including without limitation (i) any costs associated with compliance with any injunctive relief of any kind or nature imposed by any judgment or settlement, or (ii) any costs associated with providing any reasonable accommodations required by, made as a result of, or to conform with the requirements of, the Americans with Disabilities Act and any amendments thereto or any similar federal, state, local or foreign statute, regulation, or common laws;

2.  compensation earned by the claimant in the course of employment but not paid by the **Company**, including any unpaid salary, bonus, hourly pay, overtime pay, severance pay, retirement benefits, vacation days, sick days, prerequisites, stock options or similar rights; provided this exclusion shall not apply to any back pay or

front pay or any additional compensation allegedly due as a result of alleged discrimination or wrongful dismissal, discharge or termination of employment;

3. amounts owing under or assumed by the **Insured** pursuant to a written contract with or written severance obligation of the **Company**; but this exclusion shall not apply if and to the extent that liability would have attached to the **Insureds** in the absence of the written contract with or obligation of the **Company**; or

4. medical, insurance or other benefits (or the equivalent value thereof) to which the claimant allegedly was entitled or would have been entitled had the **Company** provided the claimant with a continuation or conversion of insurance;

provided this exclusion shall not apply to **Defense Costs**.

For the purpose of determining the applicability of any Exclusion set forth in this Section IV, the **Wrongful Act** or knowledge of any **Insured Person** shall not be imputed to any other **Insured Person**, and only the **Wrongful Act** or knowledge of an **Executive Officer** of a **Company** shall be imputed to such **Company** and its **Subsidiaries**.

**Endorsement #  01**

# Lay-Off Sublimit Amended



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| MPL 0239201-02 | 04/01/2020 | 04/01/2021 | 04/01/2020 | | |

**Policyholder:**   JOSE PEPPER'S RESTAURANTS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**Private Company Select Liability Insurance Policy**

[X]  Declarations

[X]  Employment Practices and Third Party Discrimination Coverage Part

It is agreed that:

I.   The following are added to Item 6.B. of the Declarations:

Sublimits of Liability:   $250,000   Each **Loss** for Each **Lay-Off Claim**

$250,000   Each **Policy Period** for all **Lay-Off Claims**

Insuring Clauses A & B (if granted) for **Each Lay-Off Claim** Retention   $100,000

II.  Section III. – DEFINITIONS of the Employment Practices and Third Party Discrimination Coverage Part is amended as follows:

A.   The following Definition is added:

**Lay-Off Claim** means any **Claim** made against any **Insured** based upon, arising out of, or attributable to any actual or alleged employment action that results is the temporary suspension or permanent termination of employment of an **Employee** or a group of **Employees** prior to the inception of this policy, often without regard to performance, for business reasons, such as the decision that certain positions are no longer necessary or a business slow-down or interruption in work.

B.   Subsection A. is amended to add the following:

**Claim** also means a **Lay-Off Claim**

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

*Clerk of the District Court, Johnson County Kansas*
*10/07/21  04:38pm NG*

Endorsement # 02

# Private Select Plus Endorsement
**(Crisis Management)**



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| MPL 0239201-02 | 04/01/2020 | 04/01/2021 | 04/01/2020 | | |

**Policyholder:**   JOSE PEPPER'S RESTAURANTS, LLC

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under:

**Private Company Select Liability Insurance Policy**

[X]  General Terms and Conditions

[ ]  Management and Company Liability Coverage Part

[X]  Employment Practices and Third Party Discrimination Liability Coverage Part

[ ]  Fiduciary Liability Coverage Part

It is agreed that:

Solely with respect to coverage provided under this endorsement for the **Liability Coverage Parts** purchased and selected above:

I.   The General Terms and Conditions are amended as follows:

    A.   The following Section is added to the policy:

    POLICY EXTENSIONS:

    TERRORISM EVENT EXPENSES

    Subject to this policy's other terms and conditions and exclusions applicable to the Coverage Part(s) purchased, the Underwriter shall pay on behalf of the **Company** any **Terrorism Event Expenses** that the **Company** incurs in connection with a **Terrorism Event** that first occurs during the **Policy Period** and is reported to the Underwriter during the **Policy Period**.  The Underwriter's maximum liability under this Extension for all covered **Terrorism Event Expenses** combined shall be $10,000, which is part of and not in addition to the applicable Limits of Liability set forth in Items 2 and 6 of the Declarations.

    PUBLIC RELATIONS EXPENSES

    Subject to this policy's other terms and conditions and exclusions applicable to the Coverage Part(s) purchased, the Underwriter shall pay on behalf of the **Company** any **Public Relations Expenses** that the **Company** incurs in connection with a **Workplace Violence Event**, **Solvency Event**, **Sexual Misconduct Event**, **Tax Status Event**, **Key Person Event**, or **Regulatory Event** that first occurs during the **Policy Period** and is reported to the Underwriter during the **Policy Period**.  The Underwriter's maximum liability under this Extension for all covered **Public Relations Expenses** combined shall be $100,000, which is part of and not in addition to the applicable Limits of Liability set forth in Items 2 and 6 of the Declarations. Solely with respect to a **Solvency Event**, the Underwriter's liability under this Public Relations Expense Extension shall cease at such time as a bankruptcy petition for relief is filed.

*Clerk of the District Court, Johnson County Kansas*
*10/07/21  04:38pm NG*

IDENTITY THEFT EVENT EXPENSES

Subject to the other terms and conditions applicable to this Coverage Part, the Underwriter shall pay on behalf of the **Company** any **Identity Theft Event Expenses** that the **Company** incurs in connection with an **Identity Theft Event** first occurring and reported to the Underwriter during the **Policy Period**. The Underwriter's maximum liability under this Extension for all covered **Identity Theft Event Expenses** combined shall be $10,000, which is part of and not in addition to the applicable Limits of Liability set forth in Items 2 and 6 of the Declarations. An **Identity Theft Event** first occurs when the **Policyholder** or any of its directors or **Executive Officers** first becomes aware of the **Identity Theft Event**.

B.  Section II. DEFINITIONS is amended to add the following:

1.  **Crisis Event** means a **Terrorism Event**, **Workplace Violence Event**, **Solvency Event**, **Sexual Misconduct Event**, **Tax Status Event**, **Key Person Event**, **Regulatory Event**, or **Identity Theft Event**.

2.  **Identity Theft Event** means: (i) an unauthorized disclosure of **Personal Information** in the care, custody or control of any **Insured**; or (ii) an unintentional violation of any **Privacy Regulation** by any **Insured**.

3.  **Identity Theft Event Expenses** means the reasonable and necessary fees and expenses incurred by an **Insured** during the period of 12 months after an **Identity Theft Event** for any public relations, crisis management, law or information technology consulting firm to:

    a.  conduct computer forensic analysis to investigate the **Company's** computer systems to determine the cause and extent of the Identity **Theft Event**;

    b.  determine indemnification obligations under any written contract with respect to any actual or alleged wrongdoing by a **Service Provider** in connection with such **Identity Theft Event**;

    c.  determine if the **Company** is obligated to notify affected customers or applicable regulatory agencies of such **Identity Theft Event**; or

    d.  plan, implement, execute and manage a public relations campaign to counter or minimize any actual or anticipated adverse effects of negative publicity from such **Identity Theft Event** or to protect or restore the **Company's** business reputation in response to negative publicity following such **Identity Theft Event**.

    Provided, however, **Identity Theft Event Expenses** shall not include (i) regular or overtime wages, salaries, or fees of the **Company's** directors, officers or employees; (ii) cost to comply with injunctive relief; (iii) taxes, fines, sanctions, or penalties; or (iv) principal, interest of other moneys paid or dues as a result of any loan, lease or extension of credit.

4.  **Key Person Event** means the death, incapacity, abduction or criminal indictment of a director or **Executive Officer** that results in the publication or broadcast of information which can reasonably be expected to damage the **Company's** reputation.

5.  **Personal Information** means any information from which an individual may be uniquely and reliably identified or contacted, including an individual's name, telephone number, social security number, medical or healthcare data or other protected health information, driver's license number or state identification number, account number, credit card number, debit card number, access code or password that would permit access to that individual's financial account or any other non-public personal information as defined in **Privacy Regulations**; provided, however, **Personal Information** does not include information lawfully available to the general public for any reason, including information from federal, state, or local government records.

6.  **Privacy Regulation** means any of the following statutes, including any amendments thereto or regulations thereunder, associated with the control and use of personally identifiable financial, medical or other sensitive information: Health Insurance Portability and Accountability Act of 1996; Gramm-Leach Bliley Act of 1999; California Security Breach Notification Act; Section 5(a) of the Federal Trade Commission Act, but solely for alleged unfair or deceptive acts or practices in or affecting commerce; MA 201 CMR 17; the Identity Red Flags under the Fair and Accurate Credit Transactions Act of 2003; and any similar state, federal or foreign identity theft or privacy protection law.

7.  **Public Relations Expenses** means the reasonable and necessary fees and expenses incurred by the **Company** for any public relations, crisis management or law firm, with the Underwriter's prior consent, to plan, implement, execute and manage a public relations campaign to counter or minimize any actual or anticipated adverse effects of negative publicity or to protect or restore the **Company's** business reputation in response to negative publicity.

Solely with respect to a **Workplace Violence Event, Sexual Misconduct Event** or **Key Person Event, Public Relations Expenses** shall include the reasonable and necessary expense of an emotional counseling seminar for **Insured Persons** conducted by an independent consultant following the **Workplace Violence Event, Sexual Misconduct Event** or **Key Person Event.**

Solely in connection with a **Key Person Event, Public Relations Expenses** include any cost to seek, interview and hire a replacement for the subject of the **Key Person Event.**

8. **Regulatory Event** means an investigation by a governmental entity that alleges the misuse of governmental funds that results in the publication or broadcast of information which can reasonably be expected to damage the **Company's** reputation.

9. **Service Provider** means a business the **Company** does not own, operate, or control, but that the **Company** hires for a fee pursuant to a written contract to: maintain, manage, or control computer systems used for the purchase of the **Company's** goods and services; facilitate the **Company's** internet website; provide computer services to the **Company**; or perform duties related to the conduct of the **Company's** business.

10. **Sexual Misconduct Event** means the publication or broadcast of information which can reasonably be expected to damage the **Company's** reputation based on an allegation that an **Insured Person**, in his or her capacity as such, has engaged in sexual abuse or assault.

11. **Solvency Event** means the threat of imminent voluntary or involuntary bankruptcy filing of the **Company** that results in the publication or broadcast of information which can reasonably be expected to damage the **Company's** reputation.

12. **Tax Status Event** means any challenge to the not-for-profit tax status of an entity formed by the **Company** that results in the publication or broadcast of information which can reasonably be expected to damage the **Company's** reputation. The Underwriter will in no way be responsible for the payment of any taxes under this extension.

13. **Terrorism Event** means an act as defined in Section 102(1)(A) of the Terrorism Risk Insurance Act of 2002.

14. **Terrorism Event Expenses** means any of the following if resulting from a **Terrorism Event** and incurred with the Underwriter's consent:

    a. reasonable and necessary travel related expenses incurred by a director or officer of the **Company**, including any hotel expense necessitated by the cancellation of previously scheduled air or rail travel and the increased costs of any replacement air or rail travel;

    b. reasonable and necessary fees incurred in retaining a real estate professional to assist the **Company** secure an alternative to its physical business location. Such fees shall not include the costs of renting or purchasing said real estate; or

    c. reasonable and necessary expenses incurred to secure temporary space for: (i) meeting with the **Company's** customers, clients, members or donors; or (ii) an event sponsored by the **Company**.

    With respect to subparagraphs b and c above, the **Company's** physical business location or the site originally scheduled for the meeting or event must have been damaged requiring temporary relocation, or destroyed as a result of the **Terrorism Event.**

15. **Workplace Violence Event** means any actual or alleged intentional and unlawful use of, or threat to use, deadly force with an intent to cause harm at the **Company's** premises that results in the publication or broadcast of information which can reasonably be expected to damage the **Company's** reputation, other than: (i) war, invasion, insurrection, riot, rebellion, revolution, civil war, or military action; or (ii) the use or threat of force or violence for the purpose of demanding money, securities or property.

C. The EXCLUSIONS section for the applicable **Liability Coverage Part** purchased shall apply to the coverage provided under this Endorsement.

D. Subsection III.B RETENTION FOR LIABILITY COVERAGE PARTS shall not apply to the coverage provided under this Endorsement.

E.   The following is added to the end of Subsection III.D:

Interrelated Events

It shall be at the sole discretion of the **Insured**, in accordance with Subsection VIII.A.1 to elect to provide notice of a **Crisis Event**.  Solely for the purpose of establishing whether any **Claim** arising out of a **Crisis Event** was first made during the **Policy Period**, such **Crisis Event** and any subsequent **Claim** having common nexus of any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes included in the original request shall be deemed:

1.   a single **Claim** first made at the time such **Crisis Event** was reported to the Underwriter expressly stating it to be submitted as a **Claim**; or

2.   if the **Crisis Event** was not reported, a single **Claim** first made at the time such **Claim** was first reported to the Underwriter.

F.   The following is added to Subsection VIII.A.1:

Additional Notice Requirements

if an **Insured** elects to seek coverage for a **Crisis Event**, the **Company** or the **Insured Person** shall give to the Underwriter written notice of any **Crisis Event** as soon as practicable after it commences but in no event later than the expiration of the **Policy Period** or thirty (30) days after the expiration of the **Policy Period** for events occurring within thirty (30) days prior to expiration.  Such notice shall include a description of the **Crisis Event** and the reason(s) why it is likely to occur.  Notice to the Underwriter shall be given to the address shown in Item 5.A of the Declarations.

Any notice to the Underwriter of a **Crisis Event** shall not constitute notice to the Underwriter of a **Claim** or a circumstance which could give rise to a **Claim** as provided in this Subsection VIII.A.1 unless such notice expressly states it to be so and otherwise conforms to the provisions herein.

II.   Subsection III.A of the Management and Company Liability Coverage Part is amended to include the following:

Solely with respect to the Extensions contained in this endorsement, **Claim** shall also include a **Crisis Event**.

III.   Subsection III.A of the Employment Practices and Third Party Discrimination Liability Coverage Part is amended to include the following:

Solely with respect to the Extensions contained in this endorsement, **Claim** shall also include a **Crisis Event**.

IV.   Subsection II.B of the Fiduciary Liability Coverage Part is amended to include the following after the end of the Definition:

Solely with respect to the Extensions contained in this endorsement, **Claim** shall also include a **Crisis Event**.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

**Endorsement #   03**

# IRCA Claims Endorsement



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| MPL 0239201-02 | 04/01/2020 | 04/01/2021 | 04/01/2020 | | |

**Policyholder:**   JOSE PEPPER'S RESTAURANTS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**Private Company Select Insurance Policy**

[X] Declarations

[X] General Terms and Conditions

[X] Employment Practices and Third Party Discrimination Liability Coverage Part

It is agreed that solely for coverage afforded pursuant to this endorsement the sections selected above are amended as follows:

I.    The following is added to Item 6.B of the Declarations:

　　$100,000　　　　Aggregate Sub-limit of Liability under Insuring Clause for IRCA CLAIM DEFENSE COSTS

　　04/01/2018　　　Pending or Prior Date for IRCA CLAIM DEFENSE COSTS

II.   The Employment Practices and Third Party Discrimination Liability Coverage Part is amended as follows:

　　A.  Section I. INSURING CLAUSES is amended to add the following:

　　　　IRCA CLAIM DEFENSE COSTS

　　　　The Underwriter shall pay on behalf of the **Company** all **Defense Costs** resulting from an **IRCA Claim** first made against the **Company** during the **Policy Period** or the **Extended Reporting Period** or **Run-Off Coverage Period**, if exercised, for a   **Wrongful Act** taking place before or during the **Policy Period**, subject to the applicable Limits of Liability set forth in Items 2 and 6.B. of the Declarations.

　　B.  Section III. DEFINITIONS is amended as follows:

　　　　1.  The following Definition is added:

　　　　　　**IRCA Claim** means an administrative proceeding against the **Company** pursuant to Section 274A.(e)(3) of the Immigration Reform and Control Act of 1986 (8 U.S.C Sec. 1324a, et set) (IRCA) including any appeal thereof pursuant to Section 274A.(e)(7) or Section 274A.(e)(8) of IRCA.

　　　　2.  Subsection III.A. – DEFINITIONS is deleted and replaced with the following:

　　　　　　A.  **Claim**, for purposes of the definitions of **Employment Practices Claim** and **Third Party Discrimination Claim** in the General Terms and Conditions, means:

　　　　　　　　1.  a written demand against any **Insured** for monetary damages or non-monetary or injunctive relief commenced by the **Insured's** receipt of such demand, including a written demand that the **Insured** toll or waive a statute of limitations;

*Clerk of the District Court, Johnson County Kansas*
*10/07/21  04:38pm NG*

2. a civil proceeding against any **Insured** commenced by the service of a complaint or similar pleading;

3. an administrative or regulatory proceeding against any **Insured**, including a proceeding before the Equal Employment Opportunity Commission or a similar state or local governmental body, commenced by the filing of a notice of charges or similar document;

4. a civil, administrative or regulatory investigation of any **Insured** commenced by the service upon or other receipt by the **Insured Person** of a target letter or other written notice from the investigating authority identifying by name the **Insured Person** as an individual against whom a proceeding may be commenced;

5. an official request for the **Extradition** of any **Insured Person** or the execution of a warrant for the arrest of any **Insured Person** where such execution is an element of **Extradition**; or

6. an arbitration or mediation proceeding against any **Insured**;

for a **Wrongful Act,** including any appeal therefrom; provided **Claim** does not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

**Claim** also means an **IRCA Claim**.

2. Subparagraph 2 in the second paragraph in the Definition of **Loss** in Section F is replaced with the following:

2. taxes, fines or penalties imposed by law; provided that **Loss** includes penalties for an **IRCA Claim**; or

III. Section IV. – EXCLUSIONS of the Employment Practices and Third Party Discrimination Liability Coverage Part is amended to add the following:

for any demand, suit proceeding, or investigation pending against any **Insured** on or prior to the date in Item 6.B. of the Declarations that alleges a **Wage and Hour Violation**, or substantially the same fact, circumstance, or situation underlying or alleged therein.

IV. General Terms and Conditions – Subsection III.B. – RETENTION FOR LIABILITY COVERAGE PARTS is amended as follows:

No Retention shall apply to **Defense Costs** incurred by the **Company** for **IRCA Claims**.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

Endorsement # 04

# Pending and Prior Litigation Exclusion
**(Increased Limits)**



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| MPL 0239201-02 | 04/01/2020 | 04/01/2021 | 04/01/2020 | | |

**Policyholder:**   JOSE PEPPER'S RESTAURANTS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**Private Company Select Insurance Policy**

☐ Management and Company Liability Coverage Part
☒ Employment Practices and Third Party Discrimination Liability Coverage Part
☐ Fiduciary Liability Coverage Part

It is agreed that:

Solely with respect to the **Liability Coverage Parts** purchased and selected above:

The Underwriter shall not be liable for **Loss** on account of, and shall not be obligated to defend, any **Claim** made against any **Insured** based upon, arising out of, or attributable to any demand, suit or proceeding pending, or order, decree or judgment entered against the **Company** or any **Insured** on or prior to 04/01/2017, or the same or substantially the same fact, circumstances or situation underlying or alleged therein.

This endorsement shall only apply to the limits of liability of $3,000,000 in excess of $1,000,000 for each **Loss** and $3,000,000 in excess of $1,000,000 for each **Policy Period**.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

# Specific Claim/Litigation Exclusion



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| MPL 0239201-02 | 04/01/2020 | 04/01/2021 | 04/01/2020 | ---- | ---- |

**Policyholder:** JOSE PEPPER'S RESTAURANTS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**Private Company Select Liability Insurance Policy**

☐   Management and Company Liability Coverage Part

☒   Employment Practices and Third Party Discrimination Coverage Part

☐   Fiduciary Liability Coverage Part

It is agreed that:

The EXCLUSIONS section of each purchased **Liability Coverage Part** selected above is amended to include the following:

The Underwriter shall not be liable for **Loss** on account of any **Claim** made against any **Insured** based upon, arising out of or attributable to the following matter(s), or the same or substantially the same **Wrongful Act**, **Interrelated Wrongful Acts**, fact, circumstance or situation underlying or alleged therein:

1.  Claim # YPRIRIHO-2057, Claimant Laura Shaw, Incident Date 12/2/2015

2.  Claim # YPRIRHO-3488, Claimant Ashley Smith, Incident Date 11/4/2016

3.  Claim # YPRIRHO-3489, Claimant Carsyn Owens, Incident Date 10/12/2016

4.  Claim # YPRIRHO-3490, Claimant Shelby Lynn Chester, Incident Date 10/12/2016

5.  Claim # YPRIRHO-3687, Claimant Anna Mitchell, Incident Date 01/27/2017

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

# Wholesale Broker Enhancement Amendatory Endorsement



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | **Add'l Prem.** | Return Prem. |
|---|---|---|---|---|---|
| MPL 0239201-02 | 04/01/2020 | 04/01/2021 | 04/01/2020 | ---- | ---- |

**Policyholder:** JOSE PEPPER'S RESTAURANTS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**Private Company Select Insurance Policy**

Declarations

General Terms and Conditions

☐   Management and Company Liability Coverage Part

☒   Employment Practices and Third Party Discrimination Liability Coverage Part

☐   Fiduciary Liability Coverage Part

Solely with respect to the **Liability Coverage Parts** selected above, it is agreed that:

I.   The Declarations are amended as follows:

    A.   Item 4.A is replaced with the following:

| | | | | |
|---|---|---|---|---|
| **Extended Reporting Period**: | Option 1: | 1. | Additional Premium: | 100% of Annual Premium |
| | | 2. | Additional Period: | 1 year |
| | Option 2: | 1. | Additional Premium: | 125% of Annual Premium |
| | | 2. | Additional Period: | 2 years |
| | Option 3: | 1. | Additional Premium: | 150% of Annual Premium |
| | | 2. | Additional Period: | 3 years |

    B.   Item 6.A is amended to add the following:

        Aggregate Sublimit of Liability for **Investigative Costs**:$250,000 for Each **Policy Period**

        **Investigative Costs** Coverage Extension Retention:   $25,000 Each **Claim**

    C.   Item 6.C is amended to add the following:

        1.   Sublimit of Liability for **Health Care Reform Act Penalties**: $100,000

        2.   Sublimit of Liability for **Pension Protection Act Penalties**: $100,000

        3.   Sublimit of Liability for **Section 4975 Penalties**: $100,000

        4.   Sublimit of Liability for **Section 502(c) Penalties**: $100,000

II.   The General Terms and Conditions are amended as follows:

    A.   Section II. GENERAL DEFINITIONS are amended as follows:

1.  Subsection II.A.2 in the definition of **Application** is replaced with the following:

2.  all publicly available documents prepared by the **Company** during the twelve (12) months preceding the inception of this policy which are reviewed by the Underwriter in connection with the underwriting of this policy or any policy issued by the Underwriter of which this policy is a direct or indirect renewal or replacement.

3.  Subsection II.G, the definition of **Employee**, is amended to add the following:

    **Employee** shall also include any intern of the **Company**;

4.  Subsection II.H is replaced with the following:

    H.  **Employment Practices Claim** means a **Claim** which is brought and maintained by or on behalf of any past, present, future or prospective **Employee(s)** of the **Company** against any Insured for any **Wrongful Act** in connection with any actual or alleged:

        1.  breach of any express or implied employment contract;

        2.  violation of any law or public policy concerning discrimination in employment whether based upon race, national origin, religion, sex, age, sexual preference, marital status, disability, medical leave, military status or genetic predisposition;

        3.  employment-related torts including without limitation wrongful termination, failure or refusal to hire or promote; wrongful discipline, wrongful reference, deprivation of a career opportunity, demotion or adverse change in terms, conditions or status of employment; wrongful failure to grant tenure; humiliation; retaliation for asserting a legal right; workplace harassment including through the use of social media and without limitation offensive, intimidating, coercive or unwelcome conduct, bullying, advances, contact or communications; negligent hiring, retention, supervision, training or performance evaluation; failure to enforce employment practices liability procedures and employment-related misrepresentation, defamation, invasion of privacy or infliction of emotional distress.

        4.  any employment-related tort as defined in subparagraph 3 above, relating to or arising from any internet activity, including but not limited to social networking activities, regardless of whether such internet activity is during work hours or on the **Company** premises

        5.  **Employee Privacy Violation** committed, attempted, or allegedly committed or attempted by the **Company** or by an **Insured Person** while acting in his or her capacity as such.

5.  Subsection II.J is replaced with the following:

    J.  **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, or any rules and regulations promulgated thereunder.

6.  Subsection II.K is replaced with the following:

    K.  **Executive Officers** means with respect to any **Company**, its chief executive officer, chief financial officer, and in-house general counsel, and solely with respect to the Employment Practices and Third Party Discrimination Liability Coverage Part, if purchased, the human resources manager, or if a **Company** does not have one of such positions, any equivalent executive position in such **Company**.

B.  Subsection III.B. RETENTION FOR LIABILITY COVERAGE PARTS is replaced with the following:

B.  RETENTION FOR LIABILITY COVERAGE PARTS

    1.  The Underwriter's liability under the **Liability Coverage Parts** with respect to **Loss** on account of each **Claim** shall apply only to that part of **Loss** which is excess of the applicable Retention set forth in the Coverage Schedule in Item 6 of the Declarations, and such Retention shall be borne by the **Insureds** uninsured and at their own risk.  No Retention shall apply to **Loss** incurred by an **Insured Person** for which the **Company** is not permitted by common or statutory law to indemnify, or is not financially able to indemnify by reason of **Financial Impairment**.

    2.  If for any reason (including but not limited to **Financial Impairment**) the **Company** fails or refuses to advance, pay or indemnify covered **Loss** of an **Insured Person** within the applicable Retention, if any, then the Underwriter shall advance such amounts on behalf of the **Insured Person** until either (i) the

**Company** has agreed to make such payments, or (ii) the Retention has been satisfied.  In no event shall any such advancement by the Underwriter relieve the **Company** of any duty it may have to provide advancement, payment or indemnification to any **Insured Person** or of any duty by the **Company** to reimburse the Underwriter for such advancement.

Advancement, payment or indemnification of an **Insured Person** by the **Company**: (i) is deemed failed if it has been requested by an **Insured Person** in writing and has not been provided by, agreed to be provided by or acknowledged as an obligation by the **Company** within sixty (60) days of such request; and (ii) is deemed refused if the **Company** gives written notice of the refusal to the **Insured Person**.  Advancement, payment or indemnification of an **Insured Person** by the **Company** shall only be deemed "failed" or "refused" to the extent such advancement, payment, or indemnification is not provided, or agreed to be provided, or acknowledged by and collectible from the **Company**.  Any payment or advancement by the Underwriter within an applicable Retention shall reduce the applicable Limit of Liability.

C.   The first paragraph of Subsection IV.B. EXTENDED REPORTING PERIOD is replaced with the following:

If the Underwriter or **Policyholder** terminates or refuses to renew this policy other than for nonpayment of premium, the **Insureds** shall have the right, upon payment of the additional premium set forth in Item 4.A.1 of the Declarations, to an extension of the coverage granted by the **Liability Coverage Parts** for the **Extended Reporting Period** set forth in Item 4.A.2 of the Declarations following the effective date of termination or nonrenewal, but only with respect to any **Wrongful Act** taking place prior to the effective date of such termination or nonrenewal.  This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due, is given by the **Insureds** to the Underwriter within sixty (60) days following the effective date of termination or nonrenewal.

D.   Subsection VI.A.2 in CHANGES IN EXPOSURE is replaced with the following:

2.   However, if such newly acquired organization is a financial institution, healthcare entity or is publicly owned then coverage under this policy or such Coverage Part as provided in subsection 1 above shall apply only if the Underwriter agrees to afford such coverage pursuant to subsection 3 below.

E.   Subsection VI.C. CESSATION OF SUBSIDIARIES is replaced with the following:

C.   CESSATION OF SUBSIDIARIES

If before or during the **Policy Period** an organization ceases to be a **Subsidiary**, coverage with respect to such **Subsidiary** and its **Insureds** shall continue until termination of this policy or any renewal of this policy, provided such coverage shall apply (i) with respect to any **Liability Coverage Parts**, only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Subsidiary**, and (ii) with respect to any **Non-Liability Coverage Part**, only with respect to **Coverage Events** taking place prior to the date such organization ceased to be a **Subsidiary**.

F.   Subsection VII.A.3 in DEFENSE AND SETTLEMENT is replaced with the following:

3.   The Underwriter may, with the consent of the **Insured**, make any settlement of any covered **Claim** which the Underwriter deems expedient. With respect to any covered **Claim**, if the **Insureds** consent to the first settlement opportunity which is recommended by the Underwriter and which is acceptable to the claimant, the applicable Retention Amount for all **Loss** on account of such **Claim** shall be retroactively reduced by ten (10%) percent.

Solely with respect to the Employment Practices and Third Party Discrimination Liability Coverage Part, if purchased, if the **Insured** against whom the **Claim** is made withholds consent to any settlement acceptable to the claimant and recommended by the Underwriter (a "Proposed Settlement"), the Underwriter's liability for all **Loss**, including **Defense Costs**, incurred by such **Insured** on account of such **Claim** shall not exceed:

a.   the amount of the Proposed Settlement plus **Defense Costs** incurred up to the date of the **Insured's** refusal to consent to Proposed Settlement of such **Claim**; and

b.   ninety percent (90%) of any **Loss**, including **Defense Costs**, in excess of the amount referenced in paragraph a above, incurred in connection with such **Claim**; subject in all events to the applicable Retention and Limit of Liability.  The remaining ten percent (10%) of any **Loss**, including **Defense Costs**, in excess of the amount referenced in paragraph a above will be borne by the **Insured** uninsured and at its own risk, notwithstanding anything to the contrary contained in Section V, Allocation.

G.  Subsection VII.B. COOPERATION is replaced with the following:

B.  COOPERATION

With respect to all Coverage Parts, the **Insureds** agree to provide the Underwriter with all information, assistance and cooperation which the Underwriter reasonably requests and agree that in the event of a **Claim** or **Coverage Event**, the **Insureds** will do nothing that shall prejudice the Underwriter's position or its potential or actual rights of recovery. The failure of any **Insured Person** to cooperate and provide information in accordance with this subsection shall not impair the rights of any other **Insured Person** under this policy.

H.  Subsection IX.B. SEVERABILITY is replaced with the following:

B.  SEVERABILITY

The **Application** shall be construed as a separate application for coverage by each of the **Insured Persons**. In the event the **Application** contains any misrepresentation or omission (i) made with the intent to deceive, or (ii) which materially affects either the acceptance of the risk or the hazard assumed by the Underwriter under a **Liability Coverage Part**, then such **Liability Coverage Part** shall be void *ab initio* as to:

1.  any **Policyholder** to the extent such **Policyholder** indemnifies an **Insured Person** who knew the facts that were not truthfully disclosed in the **Application**; and

2.  any **Policyholder** and its **Subsidiaries** and **Plans** if an **Executive Officer** of such **Policyholder** knew the facts that were not truthfully disclosed in the **Application**;

whether or not such **Executive Officer** or **Insured Person** knew the **Application** contain such misrepresentation or omission.  No knowledge of one **Insured Person** shall be imputed to any other **Insured Persons** for purposes of this Section IX.

I.  Subsection IX.C. NON-RESCINDABLE COVERAGES is replaced with the following:

C.  NON-RESCINDABLE COVERAGES

The Underwriter shall not have the right to rescind or void this policy for any reason.

J.  Section XI. OTHER INSURANCE is replaced with the following:

XI.  OTHER INSURANCE

Solely with respect to any **Liability Coverage Part**, if any **Loss** is insured under any other valid and collectible policy(ies) issued to any **Insured**, then this policy shall act as an excess insurance policy and will cover such **Loss**, subject to its limitations, conditions, provisions and other terms, only to the extent that the amount of such **Loss** is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided in this policy.

Provided however if any **Loss** is insured under any other valid and collectible (i) personal umbrella excess liability insurance policy and/or (ii) personal director liability insurance policy purchased by or on behalf of an **Insured Person**, then this policy shall cover such **Loss,** subject to its limitations, conditions, provisions and other terms on a primary basis.

K.  The second paragraph of Section XVIII. ALTERNATIVE DISPUTE RESOLUTION is replaced with the following:

If the dispute is not resolved in the mediation, then either party to the mediation may thereafter commence a judicial proceeding against the other party with respect to such dispute, provided that neither party may commence such a judicial proceeding prior to sixty (60) days following termination of the mediation.

L.  The General Terms and Conditions are amended to add the following:

STATE AMENDATORY INCONSISTENCY

If there is an inconsistency between terms and/or conditions in this Policy and the attached state amendatory endorsement, where permitted by law, the Underwriter shall apply those conditions which are more favorable to the **Insureds.**

III.  If selected above, the Management and Company Liability Coverage Part is amended as follows:

A.  Section II. EXTENSIONS is amended to add the following:

INVESTIGATIVE COST COVERAGE

The Underwriter shall reimburse the **Company** all **Investigative Costs** which the **Company** incurs on account of any **Securityholder Derivative Demand** first made against the **Company** during the **Policy Period** or, if exercised, during the **Extended Reporting Period**, for a **Wrongful Act** taking place before or during the **Policy Period**.  The Underwriter's maximum aggregate liability in each **Policy Period** under this Extension for all **Investigative Costs** incurred on account of a **Securityholder Derivative Demand** shall be the applicable Sublimit of Liability set forth in Item 6.A of the Declarations.

UK CORPORATE MANSLAUGHTER COSTS COVERAGE

Subject to this policy's other terms, conditions and exclusions, the Underwriter shall pay on behalf of the **Insured Persons** all **Corporate Manslaughter Costs** incurred by an **Insured Person** during the **Policy Period**, subject to the Limit of Liability set forth in Item 6.A of the Declarations.

As a condition precedent to their rights under this Policy, the **Insured Persons** or the **Company** shall give the Underwriter written notice of any **Corporate Manslaughter Costs** incurred by the **Insured Persons** as soon as practicable after the **Insured Person** or an **Executive Officer** first becomes aware of such **Corporate Manslaughter Costs**, but in no event later than ninety (90) days after expiration of the **Policy Period**.

Subsections IV.B and IV.C of the General Terms and Conditions shall not apply to **Corporate Manslaughter Costs**.

B.   Section III. DEFINITIONS is amended as follows:

1.   Subsection III.A, the definition of **Claim**, is amended as follows:

a.   Subsection III.A.7 is replaced with the following:

7.   an arbitration, mediation or any other alternative dispute resolution proceeding against any **Insured**; for a **Wrongful Act**, including any appeal therefrom; or

b.   Subsection III.A. is amended to add the following:

Solely with respect to the INVESTIGATIVE COSTS COVERAGE EXTENSION, **Claim** also means a **Securityholder Derivative Demand**.

2.   Subsection III.C.1 in the definition of **Insured Person** is replaced with the following:

1.   any one or more natural persons who were, now are or shall become a duly elected or appointed director, trustee, governor, **Manager**, officer, advisory director, advisory board member, or member of a duly constituted committee or board of the **Company** or their functional equivalent, or one or more natural persons who are assigned titles or positions which are functionally equivalent to directors or officers with respect to wholly owned foreign operations of the **Company**;

3.   Subsection III.E is amended to add the following:

**Loss** shall also include **Corporate Manslaughter Costs** and **Investigative Costs**.

4.   Section III. DEFINITIONS is amended to add the following:

**Corporate Manslaughter Costs** means reasonable and necessary fees, costs and expenses (other than regular or overtime wages, salaries, fees or any other form of compensation of the **Insured Persons** or **Employees** of the **Company**)  consented to by the Underwriter and incurred by an **Insured Person** in the investigation, adjustment, defense and/or appeal of a claim made against the **Company** for violation of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007 or similar criminal statute.

**Investigative Costs** means reasonable and necessary costs, charges, fees (including but not limited to attorneys' fees and experts fees) and expenses (other than regular or overtime wages, salaries, fees or any other form of compensation of the **Insured Persons** or **Employees** of the **Company**) incurred by the **Company** (including its Board of Directors or any committee of the Board of Directors) in investigating or evaluating on behalf of the **Company** whether it is in the best interest of the **Company** to prosecute the claims alleged in a **Securityholder Derivative Demand**.

**Securityholder Derivative Demand** means any written demand, by one or more securityholder(s) of the **Company**, upon the Board of Directors or Board of Managers of such **Company**, to bring a civil proceeding in a court of law against any **Insured Person** for a **Wrongful Act**.

C.   Section IV. EXCLUSIONS is amended as follows:

1.   Subsection IV.A is replaced with the following:

A.   based upon, arising out of, or attributable to any fact, circumstance or situation which has been the subject of any written notice given prior to inception of this policy and accepted under any prior directors and officers liability or comparable insurance policy or coverage part;

2.   Subsection IV.C.3 is replaced with the following:

3.   a **Claim** brought by an **Insured Person** who has not served as an **Insured Person** for at least two (2) years prior to the date such **Claim** is first made and who brings and maintains such **Claim** without the solicitation or active assistance or participation of the **Company** or any other **Insured Person** who is serving or has served as an **Insured Person** within such two (2) year period;

3.   Subsection IV.D.3 is replaced with the following:

3.   a **Claim** brought by a director, officer, manager, governor or trustee of such **Outside Entity** who has not served as such for at least two (2) years prior to the date such **Claim** is first made and who brings and maintains such **Claim** without the solicitation by, or active assistance or participation of, such **Outside Entity** or any other director, officer, manager, governor or trustee of such **Outside Entity** who is serving or has served as such within such two (2) year period;

4.   Subsection IV.E is replaced with the following:

E.   based upon, arising out of, or related to an actual or alleged violation of the responsibilities, obligations or duties imposed by **ERISA** or similar provisions of any federal, state or local statutory law or common law with respect to any pension, profit sharing, health and welfare or other employee benefit plan or trust established or maintained for the purpose of providing benefits to employees of the **Company**, or for any other matter claimed against an **Insured** in whole or in part in their capacity as a settlor of any such benefit plan or trust;

5.   Subsection IV.G is replaced with the following:

G.   based upon, arising out of or attributable to an **Environmental Event**, provided this exclusion shall not apply to:

1.   **Environmental Mismanagement Claims**; or

2.   a derivative action brought or maintained on behalf of the **Company** by one or more persons who are not **Insured Persons** if the **Claim** is brought and maintained without the solicitation or active assistance or participation of the **Company** or any **Insured Person**.

6.   Subsection IV.I is replaced with the following:

I.   based upon, arising out of or attributable to any deliberately fraudulent act or omission or any willful violation of any statute or regulation committed by such **Insured**, if a final and non-appealable adjudication adverse to such **Insured** in the underlying proceeding not brought by the Underwriter establishes such a deliberately fraudulent act or omission or willful violation; provided this exclusion shall not apply to **Defense Costs**;

7.   Subsection IV.J is replaced with the following:

J.   based upon, arising out of or attributable to such **Insured Person** gaining any personal profit, remuneration or financial advantage to which such **Insured** was not legally entitled, if a final and non-appealable adjudication adverse to such **Insured** in the underlying proceeding not brought by the Underwriter establishes such **Insured** in fact gained any such personal profit, remuneration or advantage; provided this exclusion shall not apply to **Defense Costs**;

8.   Section IV. EXCLUSIONS is amended to add the following before the last paragraph in the Section:

The Underwriter shall not be liable under this Coverage Part for **Loss** on account of, and shall not be obligated to defend, any **Claim** made against any **Insured** based upon, arising out of, or attributable to any

actual or alleged violation of the responsibilities, obligations or duties imposed by the, Equal Pay Act,  Fair Labor Standards Act  or any similar state equivalent and any other law concerning wage and hour practices, including but not limited to any **Claim** for off-the-clock work, failure to provide rest or meal periods, failure to reimburse expenses, improper classification of employees, including but not limited to misclassification as exempt or non-exempt, failure to timely pay wages, conversions, unjust enrichment, or unfair business practices;

IV.  If selected, the Employment Practices and Third Party Discrimination Liability Coverage Part is amended as follows:

A.  Section III. DEFINTIONS is amended as follows:

1.  Subsection III.A.6 in the definition of **Claim** is replaced with the following:

6.  an arbitration, mediation or any other alternative dispute resolution proceeding against any **Insured;**

2.  Subsection III.D.1 in the definition of **Insured Persons** is replaced with the following:

1.  any one or more natural persons who were, now are or shall become a duly elected or appointed director, trustee, governor, **Manager**, officer, **Employee** (including employed lawyers solely in their capacity as an **Employee**), advisory director, or member of a duly constituted committee or board of the **Company**, or their functional equivalent, or one or more natural persons who are assigned titles or positions which are functionally equivalent to directors or officers with respect to wholly owned foreign operations of the **Company**;

B.  Section IV. EXCLUSIONS is amended as follows:

1.  Subsection IV.A. is deleted in its entirety and replaced with the following:

A.  based upon, arising out of, or attributable to any fact, circumstance or situation which has been the subject of any written notice given and accepted prior to inception of this policy under any prior employment practices liability or comparable insurance policy or coverage part;

2.  Subsection IV.G is deleted in its entirety and replaced with the following:

G.  based upon, arising out of, or attributable to any deliberately fraudulent or deliberately criminal act or omission committed by such **Insured**, if a final and non-appealable adjudication adverse to such **Insured** in the underlying proceeding not brought by the Underwriter establishes such a deliberately fraudulent act or omission; provided this exclusion shall not apply to **Defense Costs**;

3.  Subsection IV.H is deleted in its entirety and replaced with the following:

H.  based upon, arising out of, or attributable to such **Insured** gaining any personal profit, remuneration or financial advantage to which such **Insured** was not legally entitled, if a final and non-appealable adjudication adverse to such **Insured** in the underlying proceeding not brought by the Underwriter establishes such **Insured** in fact gained any such personal profit, remuneration or advantage; provided this exclusion shall not apply to **Defense Costs**;

V.  If selected, the Fiduciary Liability Coverage Part is amended as follows:

A.  Section I.B. VOLUNTARY SETTLEMENT PROGRAMS is replaced with the following:

VOLUNTARY SETTLEMENT PROGRAMS

The Underwriter shall pay on behalf of the **Insureds** any **Voluntary Settlement** and **Defense Costs** which the **Insureds** become legally obligated to pay resulting from a **Settlement Program Notice** first given to the Underwriter during the **Policy Period**, provided such **Voluntary Settlement** and **Defense Costs** are incurred after such **Settlement Program Notice** is first given to the Underwriter.  The Underwriter's maximum liability under this Insuring Clause B for all covered **Voluntary Settlements** and **Defense Costs**, combined, shall be one hundred and fifty thousand dollars ($150,000), which is part of and not in addition to the applicable Limits of Liability set forth in Items 2 and 6 of the Declarations

B.  Section II. DEFINITIONS is amended as follows:

1.  Subsection II.B.7 in the definition of **Claim** is replaced with the following:

7.  an arbitration, mediation or any other alternative dispute resolution proceeding against any **Insured;**

2.  Subsection II.C. is replaced with the following:

C.  **Insured Persons** means any one or more natural persons who were, now are or shall become duly elected or appointed directors, trustees, governors, **Managers**, officers, **Employees** (including employed lawyers solely in their capacity as an **Employee**), advisory directors or members of a duly constituted committee or board of any **Company** or **Plan** or their functional equivalent, or one or more natural persons who are assigned titles or positions which are functionally equivalent to directors or officers with respect to wholly owned foreign operations of the **Company**.

3.  Subsection II.E., the definition of **Loss**, is amended as follows:

a.  Subsection II.E(b) is replaced with the following:

(b)  civil penalties imposed upon an **Insured** for violation of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, or the privacy provisions of the Health Insurance Portability and Accountability Act of 1996, as amended, provided that the Underwriter's maximum aggregate liability for all such civil money penalties under this Coverage Part shall be subject to a sublimit of two-hundred fifty thousand dollars ($250,000)  which shall be the maximum aggregate amount that the Underwriter shall pay for all such penalties and shall be part of, and not in addition to, the applicable Limits of Liability set forth in Items 2 and 6 of the Declarations; or

b.  Subsection II.E.2 is replaced with the following:

2.  taxes, fines or penalties imposed by law; provided, however this limitation does not apply to the civil penalties expressly referenced in (a), (b) or (c) above and **Section 4975 Penalties**;

c.  Subsection II.E is amended to add the following:

**Loss** shall also include **Health Care Reform Act Penalties, Pension Protection Act Penalties, Section 4975 Penalties** and **Section 502(c) Penalties**.

4.  Subsection II.J, the definition of **Wrongful Act**, is amended to add the following:

**Wrongful Act** also means any other matter claimed against an **Insured** in their capacity as a settlor of any **Plan**.

5.  Section II. DEFINITIONS is amended to add the following:

**Health Care Reform Act Penalties** means those civil penalties imposed upon an **Insured** under the following statutes - the Patient Protection and Affordable Care Act and the Health Care and Education Act of 2010, as amended, and/or the rules and regulations promulgated thereunder, including interim final rules and regulations, provided by governmental agencies (including the U.S. Department of Health and Human Services, the U.S. Department of the Treasury, the U.S. Internal Revenue Service (IRS), the U.S. Department of Labor, the Office of Consumer Information and Insurance Oversight, and the Employee Benefits Security Administration).

**Pension Protection Act Penalties** means the civil penalties under the Pension Protection Act of 2006; provided; however that such **Pension Protection Act Penalties** shall only include those imposed solely in connection with an **Insured's Administration** of a **Plan.**

**Section 4975 Penalties** means the 15% or less excise tax penalty under §4975 of the Internal Revenue Code of 1986, as amended (Section 4975 Penalties), with respect to a covered judgment; provided however that such **Section 4975 Penalties** shall only include those penalties imposed solely in connection with an **Insured's Administration** of a **Plan.**

**Section 502(c) Penalties** means the civil penalties under Section 502(c) of the Employee Retirement Income Security Act of 1974, as amended, other than penalties under the Pension Protection Act; provided; however that such **Section 502(c) Penalties** shall only include those imposed solely in connection with an **Insured's Administration** of a **Plan.**

C.  Section III. EXCLUSIONS is amended as follows:

1.  Subsection III.A. is replaced with the following:

Case 2:21-cv-02506-TC-GEB   Document 1-1   Filed 11/02/21   Page 62 of 75

A.   based upon, arising out of, or attributable to any fact, circumstance or situation which has been the subject of any written notice given and accepted prior to inception of this policy under any prior fiduciary liability or comparable insurance policy or coverage part;

2.   Subsection III.E. is deleted in its entirety and replaced with the following:

E.      based upon, arising out of or attributable to any deliberately fraudulent act or omission or any willful violation of any statute or regulation committed by such **Insured**, if a final and non-appealable adjudication adverse to such **Insured** in the underlying proceeding not brought by the Underwriter establishes such a deliberately fraudulent act or omission or willful violation; provided this exclusion shall not apply to **Defense Costs**;

All other terms, conditions, provisions and exclusions of this policy remain the same.

y
*Clerk of the District Court, Johnson County Kansas* 14-FCL-22116 (01/20)
*10/07/21  04:38pm* Page 9 of 9

# Additional Insured Amended
### (Pending & Prior Date)



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| MPL 0239201-02 | 04/01/2020 | 04/01/2021 | 04/01/2020 | ---- | ---- |

**Policyholder:** JOSE PEPPER'S RESTAURANTS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**Private Company Select Insurance Policy**

[ ]    Management and Company Liability Coverage Part

[X]    Employment Practices and Third Party Discrimination Coverage Part

[ ]    Fiduciary Liability Coverage Part

[ ]    Crime Coverage Part

It is agreed that solely with respect to the **Coverage Part** selected above:

I.    The Definition of **Company** is amended to add the companies shown in the SCHEDULE below:

<div align="center">SCHEDULE</div>

| Company | Pending or Prior Date |
|---|---|
| Espinaca, LLC | 9/23/2008 |
| Northstar Restaurants, Inc | |
| Northstar Food Services, LLC | |
| Jose Pepper's Real Estate Missouri, LLC | |
| Jose Pepper's, Inc. | |
| Cactus Grill, Inc. | |
| Jose Pepper's Grill, Inc. | |
| Jose Pepper's Midland, LLC | |
| Jose Pepper's Belton, LLC | |
| Jose Pepper's Lee's Summit, LLC | |
| Jose Pepper's 143rd, LLC | |
| Jose Pepper's Wichita 1, LLC | |
| Jose Pepper's Topeka, LLC | |
| Jose Pepper's Liberty, LLC | |
| Jose Pepper's Wichita West, LLC | |
| Jose Pepper's Mission, LLC | |

| Jose Pepper's Briarcliff, LLC | 9/23/2008 |
|---|---|
| Jose Pepper's Legends, LLC | |
| | |
| | |

but solely with respect to any **Wrongful Acts** committed or allegedly committed by the **Company** after the date of formation or acquisition. The Prior and Pending Date applicable to such **Company** shall be the date listed in the above SCHEDULE.

II. Subsection III.D. in the Management and Company Liability Coverage Part is amended to add the following to the end of the Definition:

**Insureds** shall also mean the **Insured Persons** of the **Company** listed in the SCHEDULE above and solely with respect to Insuring Clause B and Insuring Clause C, the **Company** listed in the SCHEDULE above.

III. Subsection III.E. in the Employment Practices and Third Party Discrimination Coverage Part is amended to add the following to the end of the Definition:

**Insureds** shall also mean the **Insured Persons** of the **Company** and the **Company** listed in the SCHEDULE above.

IV. Subsection II.D. in the Fiduciary Liability Coverage Part is amended to add the following to the end of the Definition:

**Insureds** shall also mean the **Insured Persons** of the **Company**, the **Company** and the **Plans** of the **Company** listed in the SCHEDULE above.

V. Subsection II.O. in the Crime Coverage Part is amended to add the following to the end of the Definition:

**Insured** shall also mean the **Company** listed in the SCHEDULE above.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

# Defense and Settlement Amended
## (Optional Election of Duty to Defend)



| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| MPL 0239201-02 | 04/01/2020 | 04/01/2021 | 04/01/2020 | --- | --- |

**Policyholder:**  JOSE PEPPER'S RESTAURANTS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the:

**Private Company Select Liability Insurance Policy**

[X]  General Terms and Conditions

It is agreed that:

I.   Subsection VII.A. is replaced with:

VII. DEFENSE AND SETTLEMENT

A.   LIABILITY COVERAGE PART DEFENSE AND SETTLEMENT

1.   a.   It shall be the duty of the **Insureds** and not the duty of the Underwriter to defend any **Claims** which are made against the **Insureds** and which are covered by the **Liability Coverage Parts**.

b.   Notwithstanding the foregoing, the **Insureds** shall have the right to elect that the Underwriter assume the duty to defend a **Claim** which is covered by the **Liability Coverage Parts**.  As a condition precedent for exercising such right, the **Policyholder** on behalf of all **Insureds** must provide written notice to the Underwriter within 15 days of the first receipt of the **Claim** by any **Insured**, clearly expressing its intent to exercise such right and requesting that the Underwriter obtain defense counsel on the **Insured's** behalf. The mere reporting of the claim shall not constitute an exercise of the right to elect that the Underwriter assume the defense of the **Claim**. This right shall terminate if not exercised within 15 days of the first receipt by any **Insured** of a **Claim** which is covered under the **Liability Coverage Parts**. The assumption of the defense of the **Claim** shall be effective upon written confirmation sent thereof by the Underwriter to the **Policyholder**. Further, from the date the **Claim** is first made against an **Insured** to the date when the Underwriter accepts the duty to defend  such **Claim**, the **Insureds** shall take no action, or fail to take any required action, that prejudices the rights of any **Insured** or the Underwriter with respect to such **Claim**. The Underwriter's duty to defend the claim, should the **Insured** elect that the Underwriter assume that duty, shall cease upon the exhaustion of the applicable Limit of Liability.

c.   When the **Insured** elects that the Underwriter assume the defense of a **Claim**, the **Insured** shall have the right to effectively associate with the Underwriter in the defense of any settlement of any **Claim**.

Regardless of whether the **Insured** elects that the Underwriter assume the defense, with respect to any **Liability Coverage Part**:

i.   The **Insureds** agree not to offer to settle or to settle any **Claim**, incur any **Defense Costs** or otherwise assume any contractual obligation, admit any liability or stipulate to any judgment with respect to any **Claim**

*Clerk of the District Court, Johnson County Kansas*
*10/07/21 04:38pm NG*

without the Underwriter's written consent, which shall not be unreasonably withheld.  The Underwriter shall not be liable for or as a result of any offer to settle, settlement, **Defense Costs**, assumed obligation, admission or stipulated judgment to which it has not given its prior consent.

ii.   The Underwriter shall have the right and shall be given the opportunity to make any investigation it deems necessary and to effectively associate with the **Insureds** in the investigation, defense and settlement, including but not limited to the negotiation of a settlement, of any **Claim** that is or reasonably could be covered in whole or in part by the **Liability Coverage Parts**.

2.   When the **Insured** retains the duty to defend a **Claim** with respect to any **Liability Coverage Part**:

a.   The **Policyholder** shall require any attorney retained as defense counsel to represent any **Insured**: (1) to comply with the requirements in Zurich's Litigation Management Guidelines, which may be accessed by going to: <www.zurichna.com>Claims>Claim Services>Legal Services>Litigation Management Guidelines>; and (2) to cooperate with the Underwriter in the defense of such **Claims**.

b.   The Underwriter's consent to a firm for the defense of **Claims** under this policy should in no way be construed to diminish the Underwriter's right to decline payment of, or to credit the Retention for, any fee, cost or expense that is not deemed to be reasonable and necessary to the defense of a **Claim** pursuant to the policy's provisions.

c.   All **Defense Costs** shall be subject to the following rate caps: partner rate of $252/hour, associate rate of $220/hour and paralegal rate of $105/hour.  The **Insureds** shall be responsible for all **Defense Costs** in excess of the aforementioned rate caps.  The referenced rates shall apply to the entire life of the **Claim**, including **Defense Costs** incurred within the Retention.

3.   The Underwriter may, with the consent of the **Insured**, make any settlement of any **Claim** covered under a **Liability Coverage Part** which the Underwriter deems expedient.  If the **Insured** has elected that the Underwriter assume the duty to defend the **Claim** pursuant to VII.A.1.b., and solely with respect to the Employment Practices and Third Party Discrimination Liability Coverage Part, if purchased, if the **Insured** against whom the **Claim** is made withholds consent to any settlement acceptable to the claimant and recommended by the Underwriter (a "Proposed Settlement"), the Underwriter's liability for all **Loss**, including **Defense Costs**, incurred by such **Insured** on account of such **Claim** shall not exceed:

a.   the amount of the Proposed Settlement plus **Defense Costs** incurred up to the date of the **Insured's** refusal to consent to Proposed Settlement of such **Claim**; and

b.   eighty percent (80%) of any **Loss**, including **Defense Costs**, in excess of the amount referenced in paragraph a above, incurred in connection with such **Claim**; subject in all events to the applicable Retention and Limit of Liability.  The remaining twenty percent (20%) of any **Loss**, including **Defense Costs**, in excess of the amount referenced in paragraph a above will be borne by the **Insured** uninsured and at its own risk, notwithstanding anything to the contrary contained in Section V, Allocation.

II.   When the **Insured** retains the duty to defend a **Claim** with respect to any **Liability Coverage Part** then Section V. ALLOCATION, is replaced with the following:

Subject to this Section V, if any **Claim** under the **Liability Coverage Parts** the **Insureds** incur both **Loss** covered by this policy and loss not covered by this policy either because the **Claim** against the **Insureds** includes both covered and uncovered matters or because the **Claim** is made against both **Insureds** who are afforded coverage for such **Claim** and others, including **Insureds** who are not afforded coverage for such **Claim**, the **Insureds** and the Underwriter shall use their best efforts to allocate such amount between covered **Loss** and uncovered loss based upon the relative legal and financial exposures of the parties to covered and uncovered matters.

If the Underwriter and the **Insureds** cannot agree on an allocation of **Defense Costs**, the Underwriter shall advance on a current basis amounts that the Underwriter believes to be covered **Defense Costs** until a different allocation is negotiated, arbitrated or judicially determined.  Any such negotiated, arbitrated or judicially determined allocation shall be applied retroactively to all **Defense Costs** on account of such **Claim**, notwithstanding any prior advancement to the contrary.  Any allocation or advancement of **Defense Costs** on account of a **Claim** shall not apply to the allocation of other **Loss** on account of such **Claim**.

Nothing in this Section V. shall limit, waive or remove the rights of any **Insured** or the Underwriter to assert claims for indemnity or contribution against third parties pursuant to any statutory or common law or any provision of this policy.

In any arbitration, suit or other proceeding among the Underwriter and the **Insureds** or the **Company**, no presumption shall exist concerning what is a fair and proper allocation between covered **Loss** and uncovered loss.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

# Preamble of Exclusions Amended
**(Portion of Loss)**

ZURICH

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| MPL 0239201-02 | 04/01/2020 | 04/01/2021 | 04/01/2020 | ---- | ---- |

**Policyholder:** JOSE PEPPER'S RESTAURANTS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under:

**Private Company Select Liability Insurance Policy**

- [ ] Management and Company Liability Coverage Part
- [X] Employment Practices and Third Party Discrimination Coverage Part
- [ ] Fiduciary Liability Coverage Part

Solely for the purpose of the **Liability Coverage Part(s)** selected above, it is agreed that:

The preamble of the Exclusions section is replaced with the following:

The Underwriter shall not be liable under this Coverage Part for that portion of **Loss** on account of, and shall not be obligated to defend, any **Claim** made against any **Insured**:

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

*Clerk of the District Court, Johnson County Kansas*
*10/07/21 04:38pm NG*

**Endorsement #**  10

# Sanctions Exclusion Endorsement



**Policyholder:**   JOSE PEPPER'S RESTAURANTS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

The following exclusion is added to the policy to which it is attached and supersedes any existing sanctions language in the policy, whether included in an Exclusion Section or otherwise:

SANCTIONS EXCLUSION

Notwithstanding any other terms under this policy, we shall not provide coverage nor will we make any payments or provide any service or benefit to any insured, beneficiary, or third party who may have any rights under this policy to the extent that such cover, payment, service, benefit, or any business or activity of the insured would violate any applicable trade or economic sanctions law or regulation.

The term policy may be comprised of common policy terms and conditions, the declarations, notices, schedule, coverage parts, insuring agreement, application, enrollment form, and endorsements or riders, if any, for each coverage provided. Policy may also be referred to as contract or agreement.

We may be referred to as insurer, underwriter, we, us, and our, or as otherwise defined in the policy, and shall mean the company providing the coverage.

Insured may be referred to as policyholder, named insured, covered person, additional insured or claimant, or as otherwise defined in the policy, and shall mean the party, person or entity having defined rights under the policy.

These definitions may be found in various parts of the policy and any applicable riders or endorsements.

**ALL OTHER TERMS AND CONDITIONS OF THIS POLICY REMAIN UNCHANGED**

Endorsement #  11



# Kansas Amendatory Endorsement

| Policy No. | Eff. Date of Pol. | Exp. Date of Pol. | Eff. Date of End. | Add'l Prem. | Return Prem. |
|---|---|---|---|---|---|
| MPL 0239201-02 | 04/01/2020 | 04/01/2021 | 04/01/2020 | | |

**Policyholder:**    JOSE PEPPER'S RESTAURANTS, LLC

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**.

This endorsement modifies insurance provided under the following:

**Private Company Select Liability Insurance Policy**

It is agreed that:

I.    The General Terms and Conditions are amended as follows:

   A.    Subsection IX.B. SEVERABILITY is replaced with the following:

   The **Application** shall be construed as a separate application for coverage by each of the **Insured Persons**.   In the event the **Application** contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the Underwriter under this policy, then this policy shall not afford coverage to:

   a.    any **Insured Person** who knew the facts that were not truthfully disclosed therein;

   b.    any **Company** to the extent such **Company** indemnifies an **Insured Person** who knew the facts that were not truthfully disclosed in the **Application**; and

   c.    any **Company** and its **Subsidiaries** and **Plans** if an **Executive Officer** of such **Company** knew the facts that were not truthfully disclosed in the **Application**;

   whether or not such **Executive Officer** or **Insured Person** knew the **Application** contained such misrepresentation or omission.  No knowledge of one **Insured Person** shall be imputed to any other **Insured Persons** for purposes of this Subsection IX.B.

   B.    Section XV is amended as follows:

   1.    The title is replaced with the following:

   POLICY CANCELLATION, NONRENEWAL AND CONDITIONAL RENEWAL

   2.    Subsection XV.A is replaced with the following:

   A.    CANCELLATION

   1.    The **Policyholder** may cancel this policy by surrender of this policy to the Underwriter or by giving prior written notice to the Underwriter stating when such cancellation shall take effect.

   2.    Except for paragraph 3 below, the Underwriter may cancel this policy only for nonpayment of premium.  In such event, the Underwriter shall mail written notice of cancellation for nonpayment of premium to the **Policyholder**.  Such notice shall state the effective date of cancellation, which shall not be less than fifteen (15) days after mailing such notice.

   3.    When this policy is in effect for ninety (90) days or more or is a renewal or continuation policy, the Underwriter may cancel this policy if there is a determination by the insurance commissioner that continuation of coverage could place the Underwriter in a hazardous financial condition or in

violation of the laws of Kansas or a determination by the insurance commissioner that the Underwriter no longer has adequate reinsurance to meet the Underwriter's needs.

4. In the event of cancellation, the Underwriter shall refund the unearned premium computed pro rata.

3. Subsection XV.C is replaced with the following:

C. CONDITIONAL RENEWAL

If the Underwriter elects to renew this policy subject to a change in terms or conditions of the policy the Underwriter shall mail written notice of the change(s) to the **Policyholder** at least sixty (60) days before the expiration of the **Policy Period**.  When there is no change other than a rate change, it is not considered a change in terms or conditions and therefore it is not necessary to send notice.

D. NOTICE

The Underwriter shall send all notices required under this Section XV by certified mail to the **Policyholder** at the address in Item 1 of the Declarations, and by mail or electronic mail to the **Policyholder's** authorized agent, if any.  Proof of mailing will be sufficient proof of notice.

C. Section XVIII. ALTERNATIVE DISPUTE RESOLUTION is deleted.

II. Subsection V.A. CONDITIONS APPLICABLE TO ALL INSURING CLAUSES of the Crime Coverage Part is amended as follows:

A. Subparagraph 1 is replaced with the following:

1. Concealment, Misrepresentation or Fraud

The Underwriter will not pay for any loss or damage in any case of: (a) concealment or misrepresentation of a material fact; or (b) fraud; committed by an **Insured** at any time and relating to the **Application** or any rating, claim or coverage under this Coverage Part.

B. The following is added Subparagraph 12.c:

Actual cash value is calculated as the amount that it would cost to repair or replace covered property with material of like kind and quality, less allowance for physical deterioration and depreciation, including obsolescence.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

*Clerk of the District Court, Johnson County Kansas*
*10/07/21  04:38pm NG*

**Endorsement #  12**

# Cap On Losses From Certified Acts Of Terrorism



| Insured's Name | Policy Number | Effective Date | Endorsement Number |
|---|---|---|---|
| JOSE PEPPER'S RESTAURANTS, LLC | MPL 0239201-02 | 04/01/2020 | 12 |

**THIS ENDORSEMENT CHANGES YOUR POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies your insurance.
**Private Company Select Insurance Policy General Terms and Conditions**

**A.  Cap on Losses From Certified Terrorism Losses**

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with provisions of the federal Terrorism Risk Insurance Act ("TRIA"), to be an act of terrorism. The Terrorism Risk Insurance Act provides that the Secretary of Treasury shall certify an act of terrorism:

1. To be an act of terrorism;

2. To be a violent act or an act that is dangerous to human life, property or infrastructure;

3. To have resulted in damage within the United States, or outside of the United States in the case of an air carrier (as defined in section 40102 of Title 49, United States Code) or a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), or the premises of a United States mission; and

4. To have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

No act may be certified as an act of terrorism if the act is committed as part of the course of a war declared by Congress (except for workers' compensation) or if losses resulting from the act, in the aggregate for insurance subject to TRIA, do not exceed $5,000,000.

If aggregate insured losses attributable to one or more "certified acts of terrorism" exceed $100 billion in a calendar year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of Treasury.

**B.  Application of Other Exclusions**

The terms and limitations of a terrorism exclusion or any other exclusion, or the inapplicability or omission of a terrorism exclusion or any other exclusion, do not serve to create coverage which would otherwise be excluded, limited or restricted under this policy.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY SHALL APPLY AND REMAIN UNCHANGED.**

*Clerk of the District Court, Johnson County Kansas*
*10/07/21  04:38pm NG*

Copyright © 2015 Zurich American Insurance Company
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
CIVIL COURT DEPARTMENT


JOSE PEPPERS RESTAURANTS LLC
                            Plaintiff                          Case No: 21CV04812
            vs                                                 Division:   7
                                                               K.S.A. Chapter 60
ZURICH AMERICAN INSURANCE COMPANY
                            Defendant


REQUEST AND SERVICE INSTRUCTION FORM


To:  Clerk of the District Court:


Please issue a SUMMONS and PETITION in this action for ZURICH AMERICAN INSURANCE
COMPANY whose address for service is:

        C/O KANSAS COMMISSIONER OF INSURANCE, KANSAS INSURANCE
DEPARTMENT, 1300 SW ARROWHEAD ROAD
        TOPEKA, KS 66604-4073


Service by an authorized process server.


                                        By: /s/ SHANNON D COHORST JOHNSON
                                        SHANNON D COHORST JOHNSON, #23496
                                        2323 GRAND BLVD STE 1000
                                        KANSAS CITY, MO 64108
                                        816-421-4460

**STATE OF KANSAS**
**DEPARTMENT OF INSURANCE**

# COMMISSIONER'S PROOF OF SERVICE

Jose Peppers Restaurants LLC

Plaintiff

VS.

Zurich American Insurance Company

Defendant

Case No.  21CV04812

District Court
Johnson County
Olathe, Kansas

I, Vicki Schmidt, Commissioner of Insurance, do hereby certify that on October 12, 2021, I received the Summons and Petition in the above captioned case.

Pursuant to K.S.A. 40-218, a copy thereof was forwarded by certified mail, return receipt requested to:

Zurich American Insurance Company
c/o Corporation Service Company
2900 SW Wanamaker Dr. Ste. 204
Topeka, KS  66614-4188

DISPOSITION:  Clerk is to indicate final disposition on second copy and forward same to:  KANSAS COMMISSIONER OF INSURANCE, 1300 SW ARROWHEAD ROAD, TOPEKA, KANSAS, 66604.



IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Official Seal at the City of Topeka, this 13th day of October, 2021.

Vicki Schmidt
Commissioner of Insurance

BY:

Justin L. McFarland
General Counsel

COURT CLERK-JOCO,KS
'21 OCT 15 PM 2:16

IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
CIVIL COURT DEPARTMENT

JOSE PEPPERS RESTAURANTS LLC
               Plaintiff

     vs

ZURICH AMERICAN INSURANCE COMPANY
               Defendant

Case No: 21CV04812
Division:   7
K.S.A. Chapter 60

## SUMMONS

To the above-named defendant:

    YOU ARE HEREBY NOTIFIED that an action has been commenced against you in this court. You are required to file your answer to the petition with the court and to serve a copy upon the plaintiff's attorney, as follows:

        Name:    SHANNON D COHORST JOHNSON
        Address: 2323 GRAND BLVD STE 1000
                  KANSAS CITY, MO 64108
        Phone:   (816) 421-4460

Within 40 days after service of summons upon you.

    If you fail to do so, judgment by default will be taken against you for the relief demanded in the attached petition, which is incorporated herein by reference. Any related claim which you may have against the plaintiff must be stated as a counterclaim in your answer, or you will thereafter be barred from making such claim in any other action.



                                 /s/ Jennie Leach
                                 Clerk of the District Court

Dated:   October 8, 2021

                  Johnson County Court House, 150 W. Santa Fe St., Olathe, KS 66061